**EQUALITY FOUNDATION OF GREATER CINCINNATI, INC. et al., Plaintiffs,**

v.

**The CITY OF CINCINNATI, Defendant.**

No. C–1–93–773.

United States District Court, S.D. Ohio, Western Division.

Aug. 9, 1994.

**420**

Alphonse Adam Gerhardstein, Scott T. Greenwood, Greenwood & Hudson, Cincinnati, OH, Patricia M. Logue, Lambda Legal Defense and Educ. Fund, Chicago, IL, Suzanne B. Goldberg, Lambda Legal Defense and Educ. Fund, New York City, for plaintiffs.

Karl Paul Kadon, III, Cincinnati, OH, for City of Cincinnati.

John Jay Fossett, Fossett Howe Wessels & Ogle, Fort Wright, KY, Michael Carvin, Shaw Pittman Potts & Trowbridge, Washington, DC, for Equal Rights Not Special Rights, Mark Miller, Thomas E. Brinkman, Jr.

Richard Adams Cordray, Ohio Atty. Gen., Columbus, OH, for Lee Fisher.

## ORDER ISSUING PERMANENT INJUNCTION

SPIEGEL, District Judge.

This matter is before the Court for decision following a bench trial conducted on June 20–24, 1994. In rendering our decision on this matter, we have considered the testimony of the witnesses, the documents admitted into evidence, the Intervening Defendants' Proposed Findings of Fact and Conclusions of Law (doc. 59), the Plaintiffs' Proposed Findings of Fact and Conclusions of Law (doc. 60), the Defendant's Post Trial brief (doc. 75), the Intervening Defendants' Supplemental Proposed Findings of Fact and Conclusions of Law (doc. 77), the Plaintiffs' Supplemental Proposed Findings of Fact and Conclusions of Law (doc. 78), and the briefs of Amici Curiae, the Ohio Human Rights Bar Association (doc. 12), the Ohio Psychological Association (doc. 14), and the Ohio Attorney General's Office (doc. 80).[1]

In weighing the testimony of the witnesses, we considered each witness' relationship to the Plaintiff or to the Defendant; their interest, if any, in the outcome of the trial; their manner of testifying, particularly where they testified in Court; their opportunity to observe or acquire knowledge concerning facts about which they testified; and the extent to which they were supported or contradicted by other credible evidence. Under Fed.R.Civ.P. 52, we have set forth our findings of fact and conclusions of law below.

The following decision represents the culmination of at least one phase of an emotional, highly controversial and hotly contested law suit. Both sides have been represented by extremely competent and thoroughly pre-

---

1. Prior to trial this Court considered the Defendant City of Cincinnati's Motion for Summary Judgement (doc. 37), the Intervening Defendant's Motion for Summary Judgment (doc. 41), the Intervening Defendant's Memorandum in Support of its Motion for Summary Judgement (doc. 40), and the Plaintiffs' Memorandum in Opposition (doc. 43). In our Order filed June 3, 1994, this Court denied those motions. See Order Denying Motions for Summary Judgement, Document 52.

pared attorneys who presented their respective cases forcefully and persuasively. In light of the nature of this case, it is to their credit that the trial on the merits proceeded in accordance with the highest spirit of cooperation and consideration for each other and the Court. Before rendering our decision, however, we must make a few things clear.

In voiding the Issue 3 Amendment, this Court is in no way giving any group any rights above and beyond those enjoyed by all citizens. To the contrary, we are simply, but crucially, preventing one group of citizens from being deprived of the very rights we all share.

Furthermore, nothing in this Order should be construed in any way as impugning the integrity or motives of those who voted in favor of the passage of the Issue 3 Amendment. Likewise we are not in any way depriving anyone of the right to vote, nor are we undermining the importance of that vote. Rather, this Order merely explores the permissible scope of governmental legislation under the Constitution. And despite the fact that a majority of voters may support a given law, rights protected by the Constitution can never be subordinated to the vote of the majority. While at times this may *seem* unfair, especially when deeply emotional issues are involved, indeed it is the fairest, and most deeply rooted, of all of this Nations rich traditions. It is in this vein that we make the following ruling.

## INTRODUCTION

In 1991 and 1992, by majority vote, the Cincinnati City Council enacted the following ordinances aimed at eradicating certain discriminatory practices within the City of Cincinnati: Cincinnati City Ordinance No. 79–1991 ("Equal Employment Opportunity Ordinance" or "EEO"), and Cincinnati City Ordinance No. 490–1992 ("Human Rights Ordinance" or "HRO").

The EEO prohibits discrimination based upon sexual orientation in city employment and in appointments to city boards and commissions. Discrimination based upon sexual orientation, whether it be heterosexual, gay, lesbian, or bisexual, is prohibited by this ordinance. The EEO also prohibits discrimination based on race, color, sex, disability, religion, national or ethnic origin, age, HIV status, Appalachian regional ancestry, and marital status.

The HRO prohibits discrimination based upon sexual orientation, in the areas of private employment, public accommodations and housing. Discrimination based upon sexual orientation, whether it be heterosexual, lesbian, gay or bisexual, is prohibited by this ordinance. The Human Rights Ordinance provides exemptions for fraternal and religious organizations and expressly prohibits use of the ordinance to create "affirmative action program eligibility." Like the EEO, the HRO also prohibits discrimination based on race, color, sex, disability, religion, national or ethnic origin, age, HIV status, Appalachian regional ancestry, and marital status. The HRO provides civil and criminal penalties for violators of its provisions.[2] It also includes a severability clause.[3]

---

**2.** Section 914–9 of the HRO provides in relevant part that if conference and conciliation fails to eliminate the offensive practices, a

 notice of violation and order to cease and desist ... shall be served on the respondent and complainant, ... [and if the unlawful discriminatory practice has not been eliminated within 30 days thereof] the Complaint Officer shall take action to refer the matter to the city manager or the city manager's designee for civil or criminal enforcement.

Section 914–11 provides that,

 If after 30 calendar days following service of an order to cease and desist, the respondent has not eliminated or corrected the unlawful discriminatory practice, the Complaint Officer is authorized to impose a fine of $100 per day for each day of substantial non-compliance

with the provisions of this chapter, but not to exceed a total of $1000.

 The city manager is authorized to institute through the city solicitor in the name of the City of Cincinnati any appropriate civil enforcement proceedings.

Finally, section 914–13 provides that,

 Any person who commits an unlawful discriminatory practice under any of the provision of this chapter and fails to obey any order of the city manager or his duly authorized designee to cease and desist such unlawful discriminatory practice shall be guilty of failure to comply with an unlawful discriminatory practice order, a misdemeanor in the fourth degree.

**3.** Section 914–17 provides that the HRO,

Largely in response to the enactment of the HRO, a group of individuals formed an organization called "Take Back Cincinnati," which later changed its name to "Equal Rights Not Special Rights." The group organized for the purpose of gathering the signatures sufficient to place on the ballot at the next general election, a proposed amendment to the Charter of the City of Cincinnati. As a result of their efforts, the proposed charter amendment, which became known as Issue 3, was placed on the November 2, 1993 ballot. Issue 3 provides in full:

## ARTICLE XII

## NO SPECIAL CLASS STATUS MAY BE GRANTED BASED UPON SEXUAL ORIENTATION, CONDUCT OR RELATIONSHIPS.

The City of Cincinnati and its various Boards and Commissions may not enact, adopt, enforce or administer any ordinance, regulation, rule or policy which provides that homosexual, lesbian, or bisexual orientation, status, conduct, or relationship constitutes, entitles, or otherwise provides a person with the basis to have any claim of minority or protected status, quota preference or other preferential treatment.

This provision of the City Charter shall in all respects be self-executing. Any ordinance, regulation, rule or policy enacted before this amendment is adopted that violates the foregoing prohibition shall be null and void and of no force or effect.

The campaign for Issue 3 was waged by its proponents largely on the theme of repealing "special rights" for homosexuals. Issue 3's proponents employed the use of, among other things, mailings, television and radio ads and speeches. The theme of gays as pedophiles and homosexuality as simply a matter of "who one chooses to have sex with"[4] were far from absent from the campaign.

The Plaintiffs campaign was waged with no less vigor, the most notorious aspect being their ubiquitous "Hitler–KKK–McCarthey" billboards appearing throughout the City. After a bitter and often inflammatory campaign, the voters of Cincinnati approved the measure by a vote of approximately 62% to 38%.

On November 8, 1993 the Plaintiffs filed this law suit challenging the constitutionality of Issue 3. The Plaintiffs allege that Issue 3 violates their rights to equal protection, free speech, free association and redress of grievances guaranteed by the First and Fourteenth Amendments to the United States Constitution. They also claim that Issue 3 is unconstitutionally vague.

With respect to their equal protection claims, they maintain that they belong to a suspect or quasi-suspect class, thus requiring strict or heightened judicial scrutiny of Issue 3. Strict scrutiny is also necessary, according to the Plaintiffs, because Issue 3 violates their constitutional right to equal access to the political process. They further maintain that Issue 3 is unconstitutional under any equal protection standard of review because it is not even rationally related to any legitimate governmental purpose. The Plaintiffs have filed this suit under 42 U.S.C. § 1983.

On the other hand, the Defendants maintain that there is no "fundamental right to equal participation in the political process" nor are the Plaintiffs members of a suspect or quasi-suspect group. Thus, they claim, Issue 3 need not be subjected to strict or heightened scrutiny, but rather only rational basis review. The Defendants have presented several governmental interests they claim Issue 3 furthers, and which, they maintain, are sufficient to survive review under any of the equal protection standards.

and each section and provision ... thereunder, are hereby declared to be independent divisions and subdivisions and, notwithstanding any other evidence of legislative intent, it is hereby declared to be the controlling legislative intent that if any provisions of said chapter, or the application thereof to any person or circumstance is held to be invalid, the remaining sections or provisions and the application of such provision to any person or circumstances other than those to which it is held invalid, shall not be affected thereby, and it is hereby declared that such sections and provisions would have been passed independently of such section or provision so known to be valid.

4. See Plaintiffs Exhibit 2, at 10; see also Plaintiffs' Exhibit 27.

For example, the Defendants claim that Issue 3 serves the governmental purposes of saving scarce resources and reducing the level of governmental regulation imposed upon the citizenry. They also claim that Issue 3 promotes diversity of thought and allows different groups in the community to hold divergent views on this question by "not imposing a uniform, doctrinaire view concerning the moral relevance of homosexual behavior on all segments of the community."

The Defendants further claim that Issue 3 gives legal effect to Cincinnati's collective notion of morality, and also serves to protect and nurture the nuclear family. Additionally, the Defendants maintain that Issue 3 advances democracy and political integrity by allowing the citizens to make this important decision for themselves and preserves their ability to define and limit the powers of their elected representatives. Issue 3, the Defendants contend, is simply a legitimate restriction on the scope of the City Council's powers to deal with certain issues of public importance.

Finally, the Defendants claim that Issue 3 does not infringe any First Amendment Rights, nor is it unconstitutionally vague. In short, the Defendants assert that Issue 3 does not impose any impermissible burdens on gays, lesbians and bisexuals.[5]

Following a contested evidentiary hearing, this court issued a preliminary injunction on November 16, 1993 prohibiting the implementation of Issue 3. A written opinion followed on November 19, 1993, *see Equality Found. v. City of Cincinnati,* 838 F.Supp. 1235 (S.D.Ohio 1993) (*"Equality"* or "Order"). The findings of fact set out in that opinion are hereby adopted and fully incorporated into this decision. The testimony received in connection with that hearing is also hereby admitted for all purposes in this case.

## THE PARTIES

### The Plaintiffs

EQUALITY FOUNDATION OF GREATER CINCINNATI, INC., is an Ohio not-for-profit corporation. Its purpose, as stated in its bylaws, "is the achievement of equality for all individuals. Equality Foundation particularly seeks to promote understanding and education concerning the issues of discrimination and hate against all people and to eliminate bigotry and discrimination against all people through public education and research." Equality Foundation was formed in an effort to oppose discrimination and promote anti-discrimination laws that include protections based upon sexual orientation when the possibility of an anti-gay initiative arose in the summer of 1993. Equality Foundation sued on its own behalf and on behalf of its members.

RICHARD BUCHANAN is a gay man residing in Cincinnati. He is an attorney with a general practice of law. Mr. Buchanan is a registered voter and a political activist who seeks to secure equal rights for lesbians, gay men and bisexuals. He is a former candidate for City Council, a member of the Cincinnati Human Relations Commission, and was a major proponent of the Cincinnati Human Rights Ordinance passed by the Cincinnati City Council in 1992.

CHAD BUSH is a gay man who has a pending charge of discrimination in public accommodations under the Cincinnati Human Rights Ordinance. Mr. Bush received a letter from the City after the passage of Issue 3 stating that it is no longer enforcing the provisions of the Human Rights Ordinance which protect Mr. Bush from discrimination.

EDWIN GREENE is an African–American gay man. He is a registered voter in and a resident of the City of Cincinnati. He alleges that he has suffered discrimination in the past at establishments covered by the Cincinnati Human Rights Ordinance due to his race and sexual orientation and anticipates that he will suffer the indignities of discrimination again at such establishments.

RITA MATHIS is an African–American lesbian who resides in, and is a registered

---

**5.** The Defendants also assert that "Since City Council itself could repeal the Human Rights Ordinances's protection of Homosexuals, the perceived constitutional evil of Issue 3 must be that this same result was obtained through direct democratic action." We disagree with this for at least one reason: it is beyond dispute that Issue 3 is more than a mere repeal measure but blocks all future city counsel legislation on behalf of gays lesbian and bisexual.

voter in, the City of Cincinnati. Ms. Mathis is a political activist who seeks to secure equal rights for lesbians, gay men and bisexuals. Ms. Mathis is also a mother who fears that the passage of Issue 3 will stigmatize her child.

ROGER ASTERINO is a gay man employed by the City of Cincinnati. Mr. Asterino has a pending charge of discrimination under the City's Equal Opportunity in Employment Ordinance.

HOUSING OPPORTUNITIES MADE EQUAL (H.O.M.E.) is a civil rights organization with diverse membership including people of all races and sexual orientations. HOME promotes equal housing opportunity for all people in Cincinnati. HOME uses existing fair housing laws including the Cincinnati Human Rights Ordinance to advocate for gay men, lesbians and bisexuals who have been denied equal housing opportunity based upon their sexual orientation. HOME sued on its own behalf and on behalf of its members.

### The Defendants

The Defendant CITY OF CINCINNATI is a municipal corporation organized and existing under the Constitution and laws of the State of Ohio and exercising the power of home rule pursuant to the Cincinnati City Charter.

The Intervening Defendant Equal Rights Not Special Rights (ERNSR) is an Ohio political organization that promoted and advocated the passage of Issue 3. ERNSR was permitted to intervene, claiming that intervention would ensure a complete defense on all issues.

The Intervening Defendants MARK MILLER, THOMAS E. BRINKMAN, Jr., and ALBERT MOORE are individuals designated as the Committee pursuant to Ohio Election law to represent the citizens who petitioned to place Issue 3 on the ballot.[6]

### SUMMARY OF TESTIMONY

The parties in this case presented at trial and through affidavits and depositions, the testimony of a variety of witness ranging from historians, political scientists and psychologists, to experts in the areas of civil rights and municipal law. These witnesses, on the whole, were extremely knowledgeable, well-prepared and credible. Among those who testified in person and via affidavit and/or deposition include, but are not limited to, the following individuals:

Dr. John Gonsiorek, a highly credentialed psychologist. He testified in person at the hearing on the motion for preliminary injunction, and also via deposition which is part of the record in this case. The subject matter of his testimony included, among other things, the psychological impact of discrimination against gays, lesbians and bisexuals on those individuals. He also testified that sexual orientation is an involuntary status, that it sets in at an early age, that it is unamenable to techniques designed to change it (which he described as unethical), and also that sexual orientation is distinct from, and exists wholly independently of, sexual behavior or conduct.

Dr. Gonsiorek also addressed numerous myths and misconceptions about homosexuals particularly those regarding pedophilia. He testified that there is no correlation between a particular orientation and pedophilia, and "that it is a myth that gay men molest children more than heterosexuals do." Transcripts of proceeding, Doc. 29(b), at 188. He also testified that there is no meaningful difference between children raised by homosexuals and those raised by heterosexuals, and that children raised by homosexuals were no more likely to be gay or lesbian or be maladjusted. Not only was Dr. Gonsiorek a very competent and credible witness, but his testimony was not seriously refuted by the defense. Significantly, counsel for the Defendants conceded during closing arguments that "your sexual orientation is not something that you choose...." See Transcript of Proceedings, Doc. 79 at 11.

The Court also received testimony from Professor George Chauncey, an historian

---

6. The Defendant City of Cincinnati, the Intervening Defendant ERNSR, and the Intervening Defendants Mark Miller, Thomas E. Brinkman, Jr., and Albert Moore, shall be collectively referred to as "Defendants" throughout this opinion.

from the University of Chicago, with expertise in social history and the social history of gays and lesbians. Professor Chauncey has impressive credentials in the above areas. He testified via affidavit and deposition.

Professor Chauncey testified extensively regarding the history of discrimination against homosexuals, and how such discrimination was both status and conduct based. He described the pervasiveness of the discrimination, both public and private, and how this anti-gay bias was perpetrated throughout all levels of society and government, from state and local law enforcement activities to a former presidential directive against homosexuals, and the purging of homosexuals from government employment and private employment by government contractors.

He also described how local laws were employed to crush early gay political organization, and how public antipathy and stereotyping was prevalent. He also described the prevalence of anti-gay violence. Professor Chauncey's testimony was not only supported by other evidence in this case, but it too was not seriously contested by the Defendants.

At the trial, John Burlew, an attorney with experience in local politics and a member of the Ohio Civil Rights Commission testified on behalf of the Plaintiffs. He testified as to the importance of political groups forming coalitions in order to obtain favorable legislation. He also stated that groups needing the help of gays, lesbians and bisexuals still refuse to form coalitions with them because of the strong dislike for that group. He stated, among other things, that because of this inability to form coalitions gays, lesbians and bisexuals have a diminished ability to obtain favorable legislation on their behalf. The Court found Mr. Burlew to be very knowledgeable, credible, and informative.

The Court also heard the testimony of Professor Kenneth Sherrill, a Professor of political science at Hunter College in New York City. Professor Sherrill offered his opinion of the relative political power of gays, lesbians and bisexuals. He testified that gays, lesbians and bisexuals experience a striking level of dislike from the population in general. He testified that because of the

hatred towards this group it is difficult for them to form political coalitions. He also noted that there are many more anti-gay initiatives than there are initiatives against other groups. In testifying that there was no "gay agenda" that he was aware of, he added that those who organized the "March on Washington" did not represent the mainstream homosexual population.

Professor Sherrill testified that federal, state and local lawmakers have proposed and enacted numerous bills and laws which limit the rights of, and public discussion about, gays lesbians and bisexuals. Professor Sherrill also testified that the gays earn roughly the same income as that of the average citizen but perhaps a bit less, and that the data collected in the United States Census reports are not entirely anonymous and that this could deter gays, lesbians and bisexuals from answering truthfully.

The Court also received the testimony via deposition of Darrell Ludlow, a consumer services investigator in the City of Cincinnati's Office of Consumer Services. Mr. Ludlow testified that the inclusion of anti-discrimination provision for gay, lesbian and bisexuals, in the Cincinnati Human Rights Ordinance did not prevent the City from enforcing the Ordinance's protection for other groups. Mr. Ludlow also testified that the Cincinnati Human Rights Ordinance did not require quotas or affirmative action for gay people.

Dr. Marcus Conant, M.D., a physician with a practice specializing in the treatment of AIDS patients, testified on behalf of the Plaintiffs via affidavit. Besides attacking many of the medical assertions found in ERNSR campaign material, he also testified that in his opinion, Issue 3 does not advance any interest in public health and is likely to be counterproductive to efforts to prevent HIV infection and its spread, and to encourage the early diagnosis and treatment of HIV infection.

On the defense side, the Court heard testimony from Dr. Allan C. Carlson, an historian and president of the Rockford Institute, in Rockford, Illinois, an organization which focuses on issues related to culture, social

trends and their effects. He testified knowledgeably and credibly regarding the importance of the family, and how the breakdown of the family generally has a detrimental impact on children and society in general. He further testified that where the family unit disintegrates the government generally must step in. This, he testified, is problematic for several reasons, including the fact that it increases government bureaucracy and because the government is not a good substitute for a healthy family unit.

Dr. Carlson also testified that there is no consensus as to the definition of "family" and that numerous definitions exists. He acknowledged that gays can be involved in committed relationships and that irresponsible heterosexual behavior was possibly more responsible for the disintegration of the family than are homosexuals. Similarly, he noted that divorce shatters the family and hurts children.

The Defendants also offered the testimony of Professor Harold Arkes, a professor of political science and jurisprudence at Amherst College in Massachusetts. He testified with respect to his view of the moral relevance of homosexuality and how it differs from that of race. He also testified, among other things, that the Human Rights Ordinance caused people to draw the inference that homosexuality was not morally wrong, and that Issue 3 allows people to think freely and to choose.

Professor James David Woodward, a professor of political science at Clemson University also testified for the Defendants. Professor Woodward testified with respect to the relative political power of gays, lesbians and bisexuals. It was his conclusion that they are not relatively politically powerless, due in part to their average level of income and education, and the level of intensity that group, although small in number, feels about certain issues. He agreed that coalition building is crucial in the quest for favorable legislation and also that, due to the unpopularity of homosexuals, most groups still resist forming coalitions with them.

The forgoing was a brief summary of the massive amount of evidence that was admitted into the record and represents only a small sample of the testimony provided by the witnesses summarized above.

## FINDINGS OF FACT

1. Homosexuals comprise between 5 and 13% of the population.

2. Sexual orientation is a characteristic which exists separately and independently from sexual conduct or behavior.

3. Sexual orientation is a deeply rooted, complex combination of factors including a predisposition towards affiliation, affection, or bonding with members of the opposite and/or the same gender.

5. Sexual behavior is not necessarily a good predictor of a person's sexual orientation.

6. Gender non-conformity such as cross-dressing is not indicative of homosexuality.

8. Sexual orientation is set in at a very early age—3 to 5 years—and is not only involuntary, but is unamenable to change.

9. Sexual orientation bears no relation to an individual's ability to perform, contribute to, or participate in, society.

10. There is no meaningful difference between children raised by gays and lesbians and those raised by heterosexuals. Similarly, children raised by gay and lesbian parents are no more likely to be gay or lesbian than those children raised by heterosexuals.

11. There is no correlation between homosexuality and pedophilia. Homosexuality is not indicative of a tendency towards child molestation.

12. Homosexuality is not a mental illness.

13. Homosexuals have suffered a history of pervasive, irrational and invidious discrimination in government and private employment, in political organization and in all facets of society in general, based on their sexual orientation.

14. Pervasive private and institutional discrimination against gays, lesbians and bisexuals often has a profound negative psychological impact on gays, lesbians and bisexuals.

15. Gays, lesbians and bisexuals are an identifiable group based on their sexual orientation and their shared history of discrimination based on that characteristic.

16. Gays, lesbians and bisexuals are often the target of violence by heterosexuals due to their sexual orientation.

17. In at least certain crucial respects, gays, lesbians and bisexuals are relatively politically powerless.

18. Coalition building plays a crucial role in a group's ability to obtain legislation in its behalf. Gays, lesbians and bisexuals suffer a serious inability to form coalitions with other groups in pursuit of favorable legislation.

19. No Federal laws prohibit discrimination based on sexual orientation. Furthermore, voter back-lash around the country has lead to the repeal of numerous laws prohibiting discrimination against gays, lesbians and bisexuals. In 38 of the approximately 125 state and local communities where some sort of measure prohibiting discrimination based on sexual orientation has been adopted, voter initiated referendums have been placed on the ballot to repeal those gains. 34 of the 38 were approved.

20. The amount of resources spent by the City on processing and investigating discrimination complaints by gays, lesbians and bisexuals is negligible. City resources spent on processing and investigating all sexual orientation discrimination complaints is negligible.

21. The inclusion of protection for homosexuals does not detract form the City's ability to continue its protection of other groups covered by the City's anti-discrimination provisions.

22. Amending the city charter is a far more onerous and resource-consuming task than is lobbying the City Council or city administration for legislation; it requires a city wide campaign and support of a majority of voters. City Council requires a bare majority to enact or adopt legislation.

23. ERNSR campaign materials were riddled with unreliable data, irrational misconceptions and insupportable misrepresentations about homosexuals.[7]

7. References in this opinion to ERNSR campaign materials are not for the purpose of establishing the "intent" of the voters of Cincinnati in voting for Issue 3. *See Arthur v. Toledo*, 782 F.2d 565, 573–74 (6th Cir.1986). Rather, this material simply emphasizes the depth and pervasiveness of the inaccurate and unfounded stereotypes about gays, lesbians and bisexuals in our society.

For example, ERNSR campaign materials and statements addressing the subject incorrectly assumed that gay and lesbian sexual orientation and identity are defined solely by engaging in sexual acts with persons of the same sex. Furthermore, despite the far broader preemptive effect on future legislation, Issue 3 was inaccurately promoted as a simple repeal of "special rights for homosexuals" through the use of television and radio advertisement, mailings, and other sources. Some of the material, including the following, made confusing and inaccurate references to the supposed criteria a group must meet to be entitled to anti-discrimination legislation: some of the material stated that,

> While the United States Constitution and Bill of Rights protects all Americans, civil rights laws have been legislated to provide special protection to certain minorities and groups of individuals. These laws and subsequent Supreme Court decisions have identified three criteria that must be met for a group to qualify for special protection:

> 1. A group wanting true minority rights must show that it is discriminated against to the point that its members *cannot earn an average income, get an adequate education or enjoy a fulfilling cultural life.*
> 2. The group must be *clearly identifiable* by unchangeable physical characteristics such as skin color, gender, handicap, age, etc.
> 3. The group must clearly show that it is *politically powerless.*

(underlined portion in original).

This excerpt from a campaign pamphlet clearly confuses the criteria supposedly used by the United States Supreme Court in determining what groups have been entitled to suspect or quasi-suspect status (erroneously implying age and disability are among those groups) and identifying those factors as ones also controlling *legislative* decisions on whether a group is entitled to anti-discrimination legislation. Such representations are inaccurate and misleading. Besides various pamphlets like the one above, the "educational" materials disseminated by the proponents of Issue 3 were patently misleading in several respects. For example, the materials repeatedly referred to "special rights" for homosexuals, while it is beyond dispute that the HRO and the EEO only provided homosexuals with the same protection accorded other groups (groups, who, unlike homosexuals, also enjoy such protection, and more, under federal and state law).

## CONCLUSIONS OF LAW

### I

### THE ISSUE 3 AMENDMENT

#### A

The HRO and the EEO are city ordinances, passed by a majority of the members of the City Council. An ordinance, once enacted, may be repealed, subject to the procedures set forth in the City Charter, by a simple majority of City Council members.[8]

Issue 3 is an amendment to the City Charter. The City Charter is the primary governance document of the city, akin to a constitution. 3 James W. Farrell, Ohio Municipal Code § 1.11(a) (11th ed. 1962). Because Issue 3 is an amendment to the City Charter, it becomes part of the city's fundamental law. As such, any and all laws, regulations, ordinances or policies of the City of Cincinnati— with the exception of other charter provisions—are inferior, and any legislation or policy to the contrary is invalid. *Fox v. Lakewood,* 39 Ohio St.3d. 19, 22, 528 N.E.2d 1254 (1988); *Reed v. Youngstown,* 173 Ohio St. 265, 266, 19 O.O.2d 119, 181 N.E.2d 700 (1962); *see;* Charter of the City of Cincinnati, art. I, art. II, §§ 1, 2. The City Charter dictates the scope of the City Council's, and all other city government's authority. *See* Ohio Const. art. XVIII, § 7; see Charter of the City of Cincinnati.

Finally, a provision of the City charter may not be repealed short of amending the charter itself. The charter amendment process, as Guy Guckenberger[9] testified, is a burdensome task that requires a city wide campaign and the support of majority of the voters; it is a far more onerous task than lobbying City Council or city administration for favorable legislation.

Issue 3 provides that the City of Cincinnati, its various boards, and commissions, may not enact, adopt, enforce or administer, any ordinance, regulation, rule or policy which would provide gays, lesbians and bisexuals with any protection or preferential treatment based on their sexual orientation, status, conduct or relationship. Nowhere are any of these terms defined, including such broad terms as homosexual "relationship," "conduct" and "status" or "protected status" and "preferential treatment." Furthermore, Issue 3's scope is extremely broad, covering not only the city's legislative arm, but also administration by the city's executive offices; it covers not only laws, but also policies promulgated by the city's various commissions and boards.

We conclude that under the plain language of Issue 3, all existing ordinances, regulations, rules or policies, enacted, adopted, enforced or administered by the city which give gays, lesbians and bisexuals protected status or preferential treatment would be null and void. Thus, Issue 3 would prohibit enforcement of those provisions in the EEO and the HRO which prohibit discrimination against gays, lesbians and bisexuals.

We further conclude, however, that Issue 3 is far more than a mere repeal measure. Because of its status as a charter amendment, the City of Cincinnati, including the City Council and all levels of city administration, would be forever barred from enacting, adopting, administering or enforcing any law or policy on behalf of gays lesbians and bisexuals, now and in the future. This sweeping prohibition would include, but would not be limited to, any anti-discrimination measures on behalf of gays, lesbians and bisexuals, and any city policies or programs specifically benefiting the gay community, no matter what the circumstances, no matter how beneficial to the City of Cincinnati as a whole. No city board or commission could so much as adopt a *policy* on behalf of gays

8. An ordinance may also be passed by popular vote through the initiative process. The other form of voter initiated legislation besides the initiative and the charter amendment is the referendum. A referendum is a second way to repeal an ordinance.

9. Mr. Guckenberger testified at the preliminary injunction hearing. He was member of the City Council for over twenty years. He left City Council in February of 1992 to assume a position as Hamilton County Commissioner, Hamilton County Ohio. The Court found him to be an extremely knowledgeable and credible witness. *See Equality,* 838 F.Supp. at 1236–38.

lesbians and bisexuals no matter what the need.

In short, under Issue 3's sweeping, all-encompassing language, the City Council and any and all aspects of city administration would no longer have the power to do anything that could be construed as "protecting" gays, lesbians and bisexuals, or giving them "preferential treatment." As Mr. Guckenberger stated, under Issue 3, elected city representatives and other city officials would be prevented from enacting, adopting, enforcing, or administering, any ordinance, rule, regulation or policy on behalf of gay, lesbian and bisexual citizens, regardless of merit. *See Equality*, 838 F.Supp. at 1237.

Thus, under its very language, Issue 3 completely excludes an entire group of citizens from all areas of city politics with respect to issues of vast importance to that group. Issue 3 completely cuts-off gay, lesbians and bisexuals from the normal and accessible avenues of political action and political participation, and requires them to seek a charter amendment any time they want or require any rule, regulation, ordinances or policy on their behalf.

Additionally, in light of the HRO's severability clause, Issue 3 would not disturb the provisions in the HRO prohibiting discrimination against persons based upon race, color, sex, disability, religion, national or ethnic origin, age, HIV status, Appalachian regional ancestry, marital status or heterosexual orientation, status, relationship or conduct.

Moreover, Issue 3 is contradictory and confusing on its face, because its title indicates its intent to repeal all protections based on sexual orientation, while the body addresses only homosexual orientation. This ambiguity creates confusion as to its scope. Further confusion is generated by its use of, without defining, such broad terms as homosexual, lesbian or bisexual "orientation, status, conduct, or relationship." Absent some guidance with respect to these terms, it is impossible to ascertain exactly what activities are covered by Issue 3 and what is not.

Thus, we conclude that, by its very terms, Issue 3 singles out persons of "homosexual, lesbian or bisexual orientation" for unique treatment not imposed upon any other segment of the community. Furthermore, Issue 3 does not target specific issue or types of problems that affect all citizens, nor does it include all citizens within its restrictions. Rather, Issue 3 targets specific citizens based upon who they are. It removes them from the normal political process and requires them to pursue a more complex, costly and burdensome avenue in pursuit of any rule, regulation, ordinance or policy, on their behalf.

**B**

In light of the forgoing, we make the following rulings regarding the Plaintiffs' constitutional challenges. As noted above, the Plaintiffs claim that Issue 3 violates their right to equal protection of the laws. They claim that Issue 3 violates their fundamental right to equal access to the political process and that they belong to a suspect or quasi-suspect category, thus requiring this Court to subject Issue 3 to strict or heightened scrutiny. At the very least, they claim, Issue 3 is not rationally related to any legitimate governmental purpose. Finally, they argue, Issue 3 violates their First Amendment rights to free speech and association and to petition the government for a redress of grievances, and that Issue 3 is unconstitutionally vague. We address the Plaintiffs' equal protection challenges in Parts II through VI, and their First Amendment and vagueness challenges in Part VII of this Order.

**II**

**CONSTITUTIONAL STANDARDS OF REVIEW UNDER THE EQUAL PROTECTION CLAUSE**

 It is well established that there are three standards of review a Court may apply in reviewing a challenge under the equal protection clause: strict scrutiny, intermediate scrutiny, and rational basis review. *See City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Legislation that infringes a fundamental right or a suspect category must be examined under the strict

scrutiny standard of review. *See Id.* Under strict scrutiny, the law must be narrowly tailored to serve a compelling governmental interest in order to withstand the constitutional attack. *Id.* Under intermediate scrutiny, the law must be substantially related to an important governmental interest. *Id.* at 441, 105 S.Ct. at 3255. Finally, under rational basis review, the law must be rationally related to a legitimate governmental purpose. *Id.* at 440, 105 S.Ct. at 3254.

## III

## FUNDAMENTAL RIGHTS

### A

■ The Plaintiffs claim that Issue 3 violates their Fundamental Right to equal participation in the political process. While we addressed this issue in the context of the Plaintiffs' Motion for Preliminary Injunction, we now conclude as a matter of law, for the reasons stated in our earlier order, that Issue 3 violates the Plaintiffs' Fundamental Right to Equal access to the political process. *See Equality Found. v. City of Cincinnati,* 838 F.Supp. 1235 (S.D.Ohio 1993); *Evans v. Romer,* 854 P.2d 1270 (Colo.), *cert. denied,* — U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993). Consequently, any legislation that disadvantages an independently identifiable group of people by making it more difficult for that group to enact legislation in its behalf, "fences" that group out of the political process, and thereby violates their fundamental rights. *See Equality,* 838 F.Supp. at 1238–42; *Evans,* 854 P.2d at 1282.

The Defendants have raised a number of arguments regarding our analysis in that Order. While we disagree with the Defendants' objections, their position is far from untenable. It is therefore important to address their objections in this order.

The Defendants claim that a number of the cases we relied upon, specifically, *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), and *Washington v. Seattle School Dist.,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), do *not* support the principle that a state may not disadvantage *any* independently identifiable group by making it more difficult for that group to obtain legislation on its behalf.[10] Rather, the Defendants argue that the doctrine enunciated in *Hunter,* and explored in subsequent cases, involves only the well established principle that legislative classifications involving suspect categories, like race, must be strictly scrutinized.

The Defendants also claim that if the Court adopts the fundamental rights theory enunciated in *Equality* and *Romer,* no issue could be relegated to the charter amendment process. According to the Defendants, all charter amendments disadvantage some "identifiable group." That "identifiable group" consists of the supporters of the issue for which the charter amendment is required. The group would be disadvantaged, like the Plaintiffs in this case, because by requiring a charter amendment, the supporters could no longer appeal directly to the City Council for legislation. Thus, the argument goes, *all* issues requiring a charter amendment would be unconstitutional under the fundamental rights theory enunciated in *Equality* and *Romer.* For the following reasons, we decline to retreat from our analysis in *Equality.* *See Equality,* 838 F.Supp. at 1238–42.

First, it is clear that the analysis in *Hunter* goes beyond a routine application of the principle that racial classifications must be strictly scrutinized. For example, the Court exhibits something of a dual analysis, at times emphasizing the purely racial aspect of the legislation involved, while at others focusing on the legislation's impact on the political

---

10. In *Hunter* the Supreme Court invalidated an Akron, Ohio city charter amendment passed by a majority of the voters providing that city council could implement no ordinance dealing with racial, religious, or ancestral discrimination in housing without the approval of a majority of the city's voters. 393 U.S. 385, 89 S.Ct. 557. In *Gordon,* the Court upheld a state's constitutional and statutory mandates requiring approval of 60% of the voters before increasing bonded indebtedness. 403 U.S. 1, 91 S.Ct. 1889. In *Washington,* the Court invalidated a statewide initiative which terminated the use of mandatory busing for the purpose of racial integration. 458 U.S. 457, 102 S.Ct. 3187.

process. *See Hunter v. Erickson,* 393 U.S. 385, 391, 391–92, 392–93, 89 S.Ct. 557, 560–61, 561–62, 21 L.Ed.2d 616 (1969). Furthermore, the Court observed in unmistakably race-neutral terms, that "the State may no more disadvantage *any particular group* by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give *any group* a smaller representation than another of comparable size." *Hunter,* 393 U.S. at 393, 89 S.Ct. at 561 (citations omitted) (emphasis added).

It is also significant that in analyzing the political participation aspect of the case, the *Hunter* Court relied exclusively on voting cases which had nothing to do with any racial classification. *See Hunter,* 393 U.S. at 393, 89 S.Ct. at 561–62 (citing *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (invalidating Alabama reapportionment plan which effectively impaired certain citizens' right to vote) and *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (striking down apportionment plan creating disparity in the weight of residents' votes)). This reliance on race-neutral cases contrasts sharply with the traditional race and ancestry cases the Court relied upon in the suspect category portion of its discussion. *See id.,* 393 U.S. at 391–92, 89 S.Ct. at 560–61. It is thus clear that, despite the Defendants' urging, something more unique was going on than the straight-forward strict scrutiny/racial classification analysis so deeply entrenched in our jurisprudence.[11]

Additionally, if the constitutional defects in *Hunter,* and *Washington v. Seattle School Dist.,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), were simply the legislative racial classifications, there would have been no need for the Court to stray from the traditional strict scrutiny analysis, and analyze the legislation's impact on the political landscape as it pertained to any group. *See Kramer v. Union Free School Dist.,* 395 U.S. 621, 628 n. 9, 89 S.Ct. 1886, 1890 n. 9, 23 L.Ed.2d 583 (1969) ("[o]f course, we have long held that if the basis of classification is

inherently suspect, such as race, the statute must be subjected to an exacting scrutiny, regardless of the subject matter of the legislation"). It is therefore, not at all surprising that the Court in *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), a case not involving race, distinguished *Hunter not* on the grounds that *Hunter* was simply a race case requiring strict scrutiny while *Gordon* was not, but rather on the basis that *Gordon* involved no "independently identifiable group or category" at all. *Equality Found. v. City of Cincinnati,* 838 F.Supp. 1235, 1241, 1241 n. 2 (S.D.Ohio 1993); *Evans v. Romer,* 854 P.2d 1270 (Colo.), *cert. denied,* —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993); *See Gordon,* 403 U.S. at 5, 7, 91 S.Ct. at 1891–92, 1892–93. Thus, unlike in *Hunter,* the *Gordon* Court observed, the legislation involved was constitutional because the Court could

> discern no *independently identifiable group or category* that favors bonded indebtedness over other forms of financing.

*Gordon v. Lance,* 403 U.S. 1, 5, 91 S.Ct. 1889, 1891–92, 29 L.Ed.2d 273 (1971) (emphasis added). On the other hand, where state or local constitutional or charter "provisions ... discriminate against or authorize discrimination against *any identifiable class* they ... violate the Equal Protection Clause." *Id.* at 7, 91 S.Ct. at 1892 (emphasis added) (footnote omitted).

Similarly, in *Washington v. Seattle School Dist.,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), the Supreme Court gave no more than a passing nod to the traditional strict scrutiny/suspect category analysis, let alone apply it in spite of the racial classification in that case. *See Id.* at 485, 102 S.Ct. at 3202–03. It can thus *not* be said that *Washington* is simply a race case. Rather the Court's holding rested on the principle that legislation which fails to "allocate governmental power on the basis of any general principle[ ]" intrudes upon the Equal Protection Clause. *See id.* at 470, 102 S.Ct. at 3195

---

11. It is also noteworthy that the *Washington* Court made reference to the "Hunter Doctrine." 458 U.S. at 473, 102 S.Ct. at 3196–97. If *Hunter* were merely a race case, the "*Hunter* doctrine" would have to refer to the well-established principle that racial classifications must be strictly scrutinized. Clearly that principle is not known as the "Hunter Doctrine."

432

(citing *Hunter*, 393 U.S. at 395, 89 S.Ct. at 562–63 (Harlan, J., concurring))

Furthermore, the *Washington* Court speaks in general, race-neutral terms with respect to the right to be free from a discriminatory political landscape. For example, the Court noted that the Fourteenth Amendment "reaches a political structure" that "distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." *Washington*, 458 U.S. at 467, 102 S.Ct. at 3193. The Court also reaffirmed the *Hunter* Court's pronouncement that "the State may no more disadvantage any *particular* group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another." *Id.* at 468, 102 S.Ct. at 3194 (emphasis added by *Washington* Court) (quoting *Hunter*, 393 U.S. at 393, 89 S.Ct. at 561–62).

Finally, the *Washington* Court concluded that,

laws structuring political institutions or allocating political power according to "neutral principles"—such as the executive veto, or the typically burdensome requirements for amending state constitutions—are not subject to equal protection attack, though they may "make it more difficult for minorities to achieve favorable legislation." 393 U.S. at 394 [89 S.Ct. at 562]. Because such laws make it more difficult for *every* group in the community to enact comparable laws, they provide[ ] a just framework within which the "diverse political groups in our society may fairly compete." *Id.* at 393 [89 S.Ct. at 561–62]. Thus, the political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action.

*Washington*, 458 U.S. at 470, 102 S.Ct. at 3195 (emphasis in original). But, when the state fails to "allocate governmental power on the basis of general principles," and thereby "disadvantages" some "independently identifiable group or category" by making it more difficult for that group or category to "to enact legislation in its behalf," the legisla-

tive provision in question must be strictly scrutinized. *See Hunter*, 393 U.S. at 393, 89 S.Ct. at 561–62; *Gordon*, 403 U.S. at 5, 7, 91 S.Ct. at 1891–92, 1892–93; *Washington*, 458 U.S. at 470, 476–77, 102 S.Ct. at 3195, 3198–99.

In support of their argument that the defining factor in these cases was the racial aspect, or lack thereof, the Defendants note that *Washington* "is rife with references to *Hunter*, but one is hard-pressed to find a citation to that case that does not simultaneously tie it to the racial classification involved." See Intervening Defendants' Proposed Findings of Fact and Conclusion of Law, Doc. 59, at 50–51 n. 7. While this is true, we find it far from dispositive. Where a statute infringes a fundamental right by placing a limitation on that right on the basis of race, the statute may have multiple constitutional defects. Thus, it is not at all surprising that a case discussing a constitutional right will speak of that right in race-specific terms if the legislation under review *also* draws a racial classification. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823–24, 18 L.Ed.2d 1010 (1967) (invalidating Virginia miscegenation law not only on the basis of its racial classification, but *also* because it violated Due Process Clause). Therefore, while we agree that *Hunter* and *Washington* are "rife" with reference to race, we do not agree that it necessarily follows that *Hunter*, *Washington* or their progeny are "race cases" and nothing more.

It is also significant that the Supreme Court in both *Hunter* and *Washington*, equated the constitutional defects in those cases to the violation of an individual's or a group's right to vote. *Hunter*, 393 U.S. at 391, 393, 89 S.Ct. at 560–61, 561 (legislation's constitutional defect was no more permissible than "dilut[ing] any person's vote or giv[ing] any group a smaller representation than another of comparable size"); *Washington*, 458 U.S. at 476, 102 S.Ct. at 3198 (same). Thus, the constitutional violations in *Hunter* and *Washington* were of the same order as those discussed in, for example, *Kramer v. Union Free School Dist.*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (invalidating law requiring children or property ownership as

precondition to vote); *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (striking down apportionment plan creating disparity in the weight of residents' votes); *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (invalidating law requiring civilian status to vote); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (invalidating Alabama reapportionment plan which effectively impaired certain citizens' right to vote). If such Issue 3–type charter amendments are tantamount to a denial of the right to vote, such charter amendments must be constitutionality infirm when they target *any* individual or group, including gays, lesbians and bisexuals.

Consequently, restructuring the political process in such a way as to make it more difficult for any "independently identifiable group," including gays lesbians and bisexuals, "to enact legislation on its behalf" is no more permissible that it is to "dilute any person's vote or give any group a smaller representation than another on comparable size." *See Hunter*, 393 U.S. at 391, 393, 89 S.Ct. at 560–61, 561; *Washington*, 458 U.S. at 470, 476, 102 S.Ct. at 3195, 3198.

We therefore conclude that *Hunter* and its progeny did not rest simply on whether the legislation drew a racial classification. Rather these case involved the infringement of rights so central to our political process, rights tantamount to the right to vote, that legislation infringing those rights must be strictly scrutinized regardless of whether any racial classification is involved.

**B**

To single out a group of citizens and place upon them the added and virtually insurmountable burden in their pursuit of protection from majority discrimination thoroughly undermines the spirit of our constitution. In our great society we adhere to the "self evident" truth that all people are created equal. And while we may disagree, and often will, such political contest is an expected and normal byproduct of a diverse and healthy democracy. This political process remains healthy and robust, however, only when all individuals are allowed to compete on an equal footing.

For these very reasons, a state may not single out and disadvantage any *independently* identifiable group by making it more difficult for that group to enact legislation in its behalf; and so doing does not "demonstrate [a] devotion to democracy" *James v. Valtierra*, 402 U.S. 137, 141, 91 S.Ct. 1331, 1333, 28 L.Ed.2d ·678 (1971), but rather makes a mockery of it. Allowing the majority to prohibit a small, unpopular group of citizens from obtaining favorable legislation unless they request it directly from the very majority that deprived them access to the legislature in the first place, violates even rudimentary notion of fundamental fairness, and undermines the integrity of our nation. No more fundamental a notion exits than that which dictates that all citizens shall have the right to *try* to obtain legislation on their behalf on an equal footing with others. Because Issue 3 contravenes these fundamental notions, it is repugnant to the Constitution, and cannot stand.

Based on the record, we conclude that under the Issue 3 Amendment, all citizens, with the exception of gay, lesbian and bisexuals, have the right to appeal directly to the city council for legislation, while only members of the Plaintiffs' independently identifiable group must proceed via the exceptionally arduous and costly route of amending the City Charter· before they may obtain any legislation bearing on their sexual orientation. Thus, Issue 3 "fences out" *see Carrington v. Rash*, 380 U.S. 89, 94, 85 S.Ct. 775, 779, 13 L.Ed.2d 675 (1965), an independently identifiable group of citizens—gays, lesbians and bisexuals—from the political process by unfairly burdening their quest for favorable legislation, regulation and policy. Issue 3, therefore, denies that group an "effective voice in the governmental affairs which substantially affect their lives." *See Kramer v. Union Free School Dist.*, 395 U.S. 621, 627, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969); *Equality*, 838 F.Supp. at 1241.

We therefore conclude that Issue 3 implicates the Plaintiffs' Fundamental Right to equal participation in the political process by singling out and disadvantaging an indepen-

**434**

dently identifiable group of citizens—gays, lesbians and bisexuals—by making it more difficult for that group to enact legislation in its behalf. The City may no more do that, than it may dilute *any* persons vote, or give *any* group a smaller representation than another of comparable size. As we conclude that Issue 3 implicates a Fundamental Right, it must be narrowly tailored to serve a compelling state interest or it must fall.[12]

## IV

## HEIGHTENED SCRUTINY

### A

▇ The Plaintiffs also claim that gays lesbians and bisexuals should be classified as a suspect or quasi-suspect class. As such, according to the Plaintiffs, the Court should subject Issue 3 to strict or heightened scrutiny. As noted above, under strict scrutiny the challenged law must be narrowly tailored to serve a compelling governmental interest. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Under heightened scrutiny the law must be substantially relat-

ed to an important governmental purpose. *Id.* at 441, 105 S.Ct. at 3255.

Although the Supreme Court has never articulated a precise test for determining which groups should be regarded as suspect or quasi-suspect, the Court has repeatedly considered a number of factors. For example, the Court has considered whether the group's defining characteristic is immutable. *See Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973).[13] The Court has also considered whether the group has suffered a history of discrimination, *Frontiero,* 411 U.S. at 684-85, 93 S.Ct. at 1769-70; *Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255; *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566-67, 49 L.Ed.2d 520 (1976), "or [if the group has been] relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio School Ind. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973) (emphasis added).[14]

Evidently the most decisive factors the Supreme Court has considered, however, are

12. The Defendants have expressed their concern that *any* group who supports a given issue for which a charter amendment is required would be an "identifiable group." Thus, they claim, the Court's holdings will "invalidate virtually every charter amendment and referendum, as virtually all legislation adversely affects [identifiable] groups" who will suffer "an inability to lobby the City Council to reverse the results of the public referendum." We agree that any time a group supports an issue for which a charter amendment must be obtained that group is "identifiable" and is in fact "disadvantaged" in the manner that the Defendants describe. However, the difference between an "independently identifiable group" and an "identifiable group" is that where the factor identifying the group transcends the mere support for any given issue, the group is "independently identifiable" within the context of *Gordon,* and *Hunter.* Thus, in *Gordon,* the fact that no "*independently* identifiable group favored bonded indebtedness" saved the provision, although clearly an *identifiable* group favored bonded indebtedness—namely, all of those individuals who *favored* bonded indebtedness. *See Gordon,* 403 U.S. 1, 91 S.Ct. 1889.

Thus, the difference between an identifiable group, and an *independently* identifiable group is that the defining characteristic of an independently identifiable group transcends the mere support for a single political issue, such as race,

gender or sexual orientation. On the other hand, a group whose sole identifying characteristic is that group's support for a single, issue is merely an identifiable group. Thus, contrary to the Defendants' concerns, our holding will not jeopardize the entire charter amendment process. Indeed, the Court has clearly upheld the constitutionality of the charter amendment process. *See Gordon,* 403 U.S. 1, 91 S.Ct. 1889 (1971) and *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331 (1971). It should also be noted that the "simple repeal or modification of … antidiscrimination laws, without more, …" is not unconstitutional. *Washington,* 458 U.S. at 483, 102 S.Ct. at 3201-02 (internal quotation omitted); *Hunter,* 393 U.S. at 390 n. 5, 89 S.Ct. at 560 n. 5.

13. We recognize that the Supreme Court has demonstrated some skepticism as to the relevance of the immutability factor. *Cleburne,* 473 U.S. at 442-43 n. 10, 105 S.Ct. at 3255-56 n. 10.

14. On at least two occasions, in determining what standard of equal protection review was appropriate, the Supreme Court noted the complex and specialized nature of the legislation and the judiciary's lack of competence to review it. Thus, the Court has at least suggested this as another relevant consideration. *See Rodriguez,* 411 U.S. at 40-43, 93 S.Ct. at 1300-02; *Cleburne,* 473 U.S. at 442-43, 105 S.Ct. at 3255-56.

whether the group's defining characteristic is at all related to its members' ability to participate in or contribute to society, *Cleburne,* 473 U.S. at 441, 442, 443, 444, 105 S.Ct. at 3255, 3256, 3256, 3256–57; *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770; *Mathews v. Lucas,* 427 U.S. 495, 505, 96 S.Ct. 2755, 2762, 49 L.Ed.2d 651 (1976); *Murgia,* 427 U.S. at 310–11, 315, 96 S.Ct. at 2565–66; *see Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2395 n. 14, 72 L.Ed.2d 786 (1982), and whether the characteristic is beyond the individual's control. *Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255 (quoting *Lucas,* 427 U.S. at 505, 96 S.Ct. at 2762); *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770; *Plyler,* 457 U.S. at 217 n. 14, 102 S.Ct. at 2395 n. 14 (1982) ("[l]egislation imposing special disabilities upon groups disfavored by virtue of circumstances beyond their control suggests the kind of 'class or caste' treatment that the Fourteenth Amendment was designed to abolish").

Thus, in observing that gender-based legislation must be subjected to heightened scrutiny, the Supreme Court observed, what "differentiates sex from such nonsuspect statuses as intelligence or physical disability ... *is that the sex characteristic frequently bears no relation to ability to perform or contribute to society."* *Cleburne,* 473 U.S. at 440–41, 105 S.Ct. at 3254–55 (emphasis added) (quoting *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770). Similarly, "[b]ecause illegitimacy is beyond the individual's control and *'bears no relation to the individual's ability to participate in and contribute to society,'* .." any legislative distinction based on that characteristic must also be subjected to heightened scrutiny. *Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255 (emphasis added) (quoting *Lucas,* 427 U.S. at 505, 96 S.Ct. at 2762).

On the contrary, where a characteristic indeed has a direct bearing on the individual's ability to function in society, the Court has declined to grant the class suspect or quasi-suspect status. For example, in *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), the Supreme Court was called upon to consider an equal protection challenge to a Massachusetts statute requiring mandatory retirement for uniformed police officers at the age of 50. The rationale for mandatory retirement was "to protect the public by assuring physical preparedness of its uniformed police." *Id.* at 314, 96 S.Ct. at 2567 (footnote omitted).

The Court applied the rational basis test and found the statute did not violate the Equal Protection Clause. In declining to apply a heightened level of scrutiny, the court emphasized that "there is a general relationship between advancing age and decreasing physical ability...." *Id.* at 310–11, 96 S.Ct. at 2565 (internal quotations omitted); *see id.* at 314–15, 314–15 n. 7, 96 S.Ct. at 2567–68, 2567–68 n. 7. The court further observed that,

> [w]hile the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike say, those who have been discriminated against on the basis of race or national origin, have not experienced a *history of purposeful unequal treatment* or been subjected to unique disabilities *on the basis of stereotyped characteristics not truly indicative of their abilities.*

*Id.* at 313, 96 S.Ct. at 2566–67 (internal quotations omitted) (emphasis added); *Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255.

Similarly, in *City of Cleburne v. Cleburne Living Ctr., Inc. Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Court was called upon to determine whether the mentally retarded should be granted quasi-suspect status. The Court observed that quasi-suspect status has been reserved for those groups whose defining characteristic is beyond the individual's control and bears no relation to the individual's ability to perform or to participate in, or contribute to, society. *See Id.* at 440–441, 105 S.Ct. at 3254–55 (citing *Frontiero,* 411 U.S. at 686, 93 S.Ct. at 1770 and *Lucas,* 427 U.S. at 505, 96 S.Ct. at 2762). In concluding that the Court of Appeals had erred in holding mental retardation a quasi-suspect classification, the Supreme Court repeatedly emphasized the fact that the mentally retarded have "a reduced ability to cope with and function in the everyday world." *Id.,* 473 U.S. at 442, 105 S.Ct. at 3255–56; *see id.* at 443, 444, 105 S.Ct. at 3256, 3256–57.

Thus, while mental retardation is immutable and beyond the individual's control, there is indeed, as the Court found, an "undeniable" relationship between mental retardation and the individual's abilities. *Id.* at 442, 444, 105 S.Ct. at 3255–56, 3256–57. Legislation bearing on mental retardation, therefore is not presumptively invalid:

> Because mental retardation is a characteristic that the government may legitimately take into account in a wide range of decisions, and because both State and Federal Governments have recently committed themselves to assisting the retarded [beyond merely prohibiting discrimination against them], we will not presume that any given legislative action, even one that disadvantages retarded individuals, is rooted in considerations that the Constitution will not tolerate.

*Cleburne,* 473 U.S. at 446, 105 S.Ct. at 3257–58.

Thus, where the characteristic, like race, gender, illegitimacy or national origin, is determined by causes beyond the individual's control and bears no relation to the individual's ability to perform or to participate in, or contribute to, society and especially where the class has suffered a history of discrimination based on stereotyped notions of that characteristic, any legislation resting on such an irrelevant characteristic likely reflects nothing more than invidious stereotypes beyond the scope of any permissible governmental purpose.[15] While most legislation enjoys a presumption of constitutionality, *Heller v. Doe,* —— U.S. —— ——, ——, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993), legislation based on invidious criteria is not entitled to that presumption and must be carefully scrutinized by the judiciary.

Thus in determining whether this Court should find that gays lesbians and bisexuals constitute a quasi-suspect class mandating heightened scrutiny of any legislation drawing a distinction based on sexual orientation, the court must consider:

> (1) whether an individual's sexual orientation bears any relationship to his or her ability to perform, or to participate in, or contribute to, society;
>
> (2) whether the members of the group have any control over their sexual orientation;
>
> (3) whether sexual orientation is an immutable characteristic;
>
> (4) whether that group has suffered a history of discrimination based on their sexual orientation; and
>
> (5) whether the class is "politically powerless."

Based on the record before the Court and our careful reading of the case law in this area, we conclude that sexual orientation is a quasi-suspect classification. Therefore, laws drawing a distinction based on that characteristic must be substantially related to a sufficiently important governmental purpose.

## B

### 1

First, we conclude that gays, lesbians and bisexuals have suffered a history of invidious discrimination based on their sexual orientation. This is not a unique conclusion. *See High Tech Gays v. Defense Indus. Sec. Clearance Office.,* 895 F.2d 563, 573 (9th Cir.1990); *Dahl v. Secretary of the United States Navy,* 830 F.Supp. 1319, 1324 n. 7 (E.D.Cal.1993); *see also, Rowland v. Mad River Local School District,* 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1376–77, 84 L.Ed.2d 392 (1985) (Brennan, J., dissenting from denial of *cert.*). Gays, lesbians and bisexuals have been stigmatized throughout history based on erroneous stereotypes and mischaracterizations regarding their sexual orientation. Gays, for example, have been characterized as effeminate mental defects with a proclivity towards pedophilia, and a host of other deviant sexual practices.[16] Gays have been sub-

---

**15.** Thus, the Supreme Court has noted, "[s]ome classifications are more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective." *Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982).

**16.** In fact ERNSR campaign literature accused homosexuals of habitually engaging in a wide range of activities, some of which allegedly involve the use of rodents, fists, and other objects. These inflammatory assertions were thoroughly rebutted by the Plaintiffs' expert, Dr. Conant.

jected to pervasive private discrimination as well as public discrimination on the local, state and federal levels.

Furthermore, homosexuality was long considered a mental illness—a notion since discarded by the medical community—amenable to aversion therapy, and other "treatments" now considered ineffective and unethical. Gays have been black listed and rooted out of government service and subjected to arrest and censorship and much more over the years. We conclude that it is a matter of fact beyond dispute that gays, lesbians and bisexuals have suffered a history of discrimination based on inaccurate, stereotyped notions of their sexual orientation.

### 2

We also conclude that sexual orientation, whether hetero- homo-, or bisexual, bears no relation whatsoever to an individual's ability to perform, or to participate in, or contribute to, society. See Cammermeyer v. Aspin, 850 F.Supp. 910, 922 (W.D.Wash.1994) ("there is no study showing [homosexuals] to be less capable or more prone to misconduct." "[F]emale homosexual[s] in the Navy [are] hardworking, career-oriented, willing to put in long hours on the job and among the command's top professionals"). Indeed the American Psychological Association has so concluded, and no evidence was produced remotely indicating otherwise. If homosexuals were afflicted with some sort of impediment to their ability to perform and to contribute to society, the entire phenomenon of "staying in the Closet" and of "coming out" would not exist; their impediment would betray their status.

### 3 & 4

Furthermore, we conclude that homo-, hetero-, and bisexual orientation is a characteristic beyond the control of the individual. Credible and unrebutted testimony established that sexual orientation sets in at an early age, around 3–5 years, and is simply a matter of development beyond that stage. Furthermore, evidence amply established, and we conclude, that there is a broad distinction between sexual orientation, and sexual conduct. See, e.g., Cammermeyer, 850 F.Supp. at 919–19 ("[p]laintiff has also provided the Court with substantial uncontroverted evidence that a distinction between homosexual orientation and homosexual conduct is well grounded in fact"). Sexual orientation, as Dr. Gonsiorek put it, "is a predisposition toward erotic, sexual, affiliation or affection relationship towards one's own and/or the other gender," and is not simply defined by any conduct. See Transcripts of Proceedings, Doc. 29(b), at 173–174. In fact, evidence demonstrated that sexual activity is not even necessarily a good predictor of one's sexual orientation.

Thus, while sexual conduct may be a matter of volition, sexual orientation is not. Sexual orientation is therefore not simply a matter of who one chooses to have sex with, but rather is a much deeper, more complex and involuntary state of being. We therefore conclude that sexual orientation is a characteristic not only beyond the control of the individual, but also one existing independently of any conduct that the individual, hetero-, homo- or bisexual, may choose to engage in. Furthermore, relevant and credible evidence revealed that sexual orientation is unamenable to techniques designed to change it, and that such techniques are considered unethical.

### 5

Finally, to the extent it is relevant, we conclude that Plaintiffs, while not a wholly politically powerless group, do suffer significant political impediments.[17] First, while the

---

17. Throughout this litigation much attention has been focused on whether gays lesbians and bisexual's are "politically powerless." While we recognize that the Supreme Court has touched upon this variable in several cases, it is by no means the controlling criteria in determining suspect or quasi-suspect status. Because, the "Equal Protection Clause protects against arbitrary and irrational classifications, and against invidious discrimination stemming from prejudice and hostility[,]" Plyler v. Doe, 457 U.S. 202, 245, 102 S.Ct. 2382, 2409–10, 72 L.Ed.2d 786 (1982) (Burger, C.J., dissenting), whether a class is labeled "suspect" or "quasi-suspect" should not be controlled by, nor do we think the Supreme Court has ever held that it is controlled by, a group's ability to pass or fail some ill-defined political power test.

Additionally, relative political power cannot even be a particularly weighty factor, let alone a controlling one. For example, it cannot be said

438

evidence as to whether gays, lesbians and bisexuals earn an income or have an educational level above that of the average American was inconclusive, evidence indicated that homosexuals earn an income roughly equal to that of the national average. Similarly, the amount of money spent on political action committees ("PACs") was also inconclusive. Much of the difficulty in compiling this data appears to stem from the reluctance of gays to risk exposure by responding to questions and identifying themselves as gay, lesbian or bisexual. In fact, it is this factor which undermines the validity of the generally reliable United States Census report in this area for, as testimony established, the Census is not wholly anonymous. It is therefore not possible for the Court to determine the extent of the financial resources available to gays lesbians and bisexuals as a group, and to what extent that money is dedicated to obtaining political results.[18]

On the other hand, undisputed evidence was offered demonstrating that gays, lesbians and bisexuals are confronted with distinct obstacles in the political arena. Testimony from both the Defendants' and the Plaintiffs' witness demonstrated that it is crucial for political minorities to form coalitions in order to achieve legislative success. All groups are a minority on specific issues, and thus all groups must form coalitions in order to obtain beneficial legislation. As a result, groups that normally do not agree must get together to form coalitions. Evidence revealed that even those groups that need the help of gays, lesbians and bisexuals refuse to form coalitions with them because of their strong feeling of dislike for these groups. For these reasons, gay political power is seriously curtailed.

that males, as a group, have been relegated to such a position of political powerlessness as to require special judicial protection. Nonetheless, laws differentiating between the sexes which disadvantage males as well as females, must be subjected to heightened scrutiny. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 723, 102 S.Ct. 3331, 3335, 73 L.Ed.2d 1090 (1982); *Craig v. Boren,* 429 U.S. 190, 204, 97 S.Ct. 451, 460, 50 L.Ed.2d 397 (1976). Thus, the fact that gender is beyond the individual's control and is generally totally irrelevant must be far more controlling than any political power analysis. Similarly, if political power were the overriding factor, political gains by women and racial minorities could threaten their protected status.

Furthermore, the only cases this Court is aware of that gives some semblance of guidance as to what even constitutes a groups's relative political power are *Frontiero,* 411 U.S. 677, 93 S.Ct. 1764 and *Cleburne,* 473 U.S. 432, 105 S.Ct. 3249. In neither case did the Court explore whether the group involved had the ability to form coalitions or to what extent they contributed money to PACs. In *Frontiero,* for example, the Court noted the absence of women in this country's "decisionmaking councils." 411 U.S. at 686, 686 n. 17, 93 S.Ct. at 1770, 1770 n. 17.

In *Cleburne,* the Court reviewed legislation designed to benefit the mentally retarded, noting that much state and federal legislation went beyond merely prohibiting discrimination against that group. *Cleburne,* 473 U.S. at 443–45, 105 S.Ct. at 3256–58. The thrust of that analysis was not to explore the political power of the group as such, but rather to underline the error in the view that laws drawing a distinction on mental ability should be *presumed* invidious and therefore unconstitutional. The Court observed that in fact the opposite was true: "[I]n the vast majority of situations" the legislative response to the plight of the mentally retarded, both federal and state, has been both "legitimate [and] ... desirable." *Id.* at 444, 105 S.Ct. at 3256–57. In order for a law to be subject to heightened scrutiny, it must have lost the general presumption that it is rational and legitimate. In the case of the mentally retarded, the "vast majority" of laws dealing with that group benefit them, going beyond merely prohibiting discrimination. The Court also discussed how mental retardation bore on an individual's abilities and was a legitime subject of legislation. It therefore defies logic and experience to *presume* that a law based on that criteria is unconstitutional.

Furthermore, in most cases the Supreme Court has no more than made passing reference to the "political power" factor without ever actually analyzing it. *See, e.g., Bowen v. Gilliard,* 483 U.S. 587, 602, 107 S.Ct. 3008, 3017–18, 97 L.Ed.2d 485 (1987); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976); *San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). Thus, while these Courts have given the test differing degrees of attention, one thing is apparent to this Court: the significance of the test pales in comparison to the question of whether or not the characteristic bears any relationship to the individuals ability to function in society, whether the group has suffered a history of discrimination based on misconceptions of that factor and whether that factor is the product of the group's own volition.

**18.** There was also conflicting testimony on the ultimate impact PAC money has on lawmakers' actual votes.

It is also significant that of 38 Issue 3–type ballot initiative campaigns waged in communities across the country, 34 were approved by the voters. According to one witness, the four that were not approved, simply "went beyond the pale" as far as their discriminatory effect on gays, lesbians and bisexuals. This not only bespeaks the level of hostility towards gays, but also the fact that whatever political gains they have made are in peril. Thus, whatever bonefide legislative victories gays, lesbians and bisexual may have achieved in recent years, those victories are being "rolled back" at an unprecedented rate and in an unprecedented manner.[19]

Furthermore, openly gay, lesbian and bisexual individuals are almost entirely absent from the "Nation's decisionmaking councils" as were women at the time of the *Frontiero* decision. *See Frontiero,* 411 U.S. at 686 n. 17, 93 S.Ct. at 1770 n. 17.[20] We thus conclude, to the extent that it is relevant to a group's suspect- or quasi-suspect status, gays, lesbians and bisexuals do not enjoy that type of legislative success, political representation, or political alliances building capability necessary to be considered a politically powerful group.

### C

Finally, we acknowledge that numerous Courts of Appeals have ruled on the issue of whether sexual orientation should be accorded suspect or quasi-suspect status, and all have decided in the negative. We disagree, however, with the fundamental underpinning of those decisions—that homosexuality is a status defined by conduct—and therefore decline to follow their reasoning.

Several of these cases based their decision not to grant suspect or quasi-suspect status to homosexuals on the conclusion that *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), posed an "insurmountable barrier[ ]" to such a holding. *Padula v. Webster,* 822 F.2d 97, 102 (D.C.Cir. 1987). In *Bowers,* the Supreme Court held that laws criminalizing homosexual sodomy did not run afoul of the Due Process Clause because there is no fundamental right to engage in homosexual sodomy. *Bowers,* 478 U.S. at 191–192, 106 S.Ct. at 2844.

In light of *Bowers,* the D.C.Circuit concluded that,

> [i]t would be quite anomalous, on its face, to declare *status defined by conduct* that states may constitutionally criminalize as deserving of strict [or heightened] scrutiny under the equal protection clause. More importantly, in all those cases in which the Supreme Court has accorded suspect or quasi-suspect status to a class, the Court's holding was predicated on an unarticulated, but necessarily implicit, notion that it is plainly unjustifiable (in accordance with standards not altogether clear to us) to discriminate invidiously against the particular class.... If the Court [in *Bowers* ] was unwilling to object to state laws that criminalize the *behavior that defines the class,* it is hardly open to a lower court to conclude that state sponsored discrimination against the class is invidious.

*Padula,* 822 F.2d at 103 (citations omitted) (emphasis added); *accord High Tech Gays v. Defense Indus. Sec. Clearance Office.,* 895 F.2d 563, 571–72 n. 6, 573–74 (9th Cir.1990) (emphasis added) (homosexuality is "*behavioral* and hence is fundamentally different from traits such as race, gender, or alienage, which define already existing suspect and quasi-suspect classes.... The *behavior or conduct* of such already recognized classes is irrelevant to their identification"); *Woodward v. United States,* 871 F.2d 1068, 1076 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990) (homosexuals held not suspect or quasi-suspect class because "[t]he *conduct or behavior* of the members of a recognized suspect or qua-

19. Indeed, Mr. Guckenberger testified at the hearing on the motion for preliminary injunction, that he knew of no other time in the history of the City of Cincinnati when such a charter amendment was enacted. See *Equality,* 838 F.Supp. at 1238.

20. According to the Plaintiffs' statistics, there are 497,155 elected officials in the United States. There are no openly gay or lesbian United States Senators; 2 openly gay members of the House of Representatives; 12 of the 7,461 state legislators are openly gay; of the total of 497,155 elected officials in the United States, a total of 73 are openly gay.

si-suspect class has no relevance to the identification of those groups" whereas "homosexuality is primarily *behavioral* in nature") (emphasis added); *Ben–Shalom v. Marsh,* 881 F.2d 454, 464–465 (7th Cir.1989), *cert. denied, Ben–Shalom v. Stone,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) ("[i]f homosexual conduct may constitutionally be criminalized, then homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny for equal protection purposes"). Because we expressly reject the notion that homosexual orientation is "defined by" any conduct, we decline to adopt the reasoning of these courts.[21]

Rather, as discussed above, we conclude that sexual orientation, whether homosexual or heterosexual, exists independently of any conduct. Consequently, neither *Bowers,* nor the reasoning of *High Tech Gays, Woodward, Padula, Ben–Shalom,* nor any of the other cases similarly ruling, is controlling. *Bowers,* therefore, does not preclude a finding that gays, lesbians and bisexuals constitute a quasi-suspect class.

Accordingly, based on the forgoing, we conclude that gays, lesbians and bisexuals meet the requisite criteria for quasi-suspect status. Thus, laws drawing a distinction based on sexual orientation must be subjected to intermediate scrutiny. Issue 3 therefore, must be substantially tailored to a sufficiently important governmental interest or it is unconstitutional.

# V

## RATIONAL BASIS

The Plaintiffs also assert that under the rational basis test, Issue 3 must be declared unconstitutional. For the reasons that follow, we agree. "The equal protection clause of the Fourteenth Amendment commands that no State shall 'deny to any per-son within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). Furthermore, while under the rational basis test, the courts must accord legislatures great deference, and in fact the legislature is presumed to have acted constitutionally, *Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993), "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne,* 473 U.S. at 446, 105 S.Ct. at 3257–58 (citing *Zobel v. Williams,* 457 U.S. 55, 61–63, 102 S.Ct. 2309, 2313–14, 72 L.Ed.2d 672 (1982) and *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 535, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973)); *Bannum, Inc. v. City of Louisville,* 958 F.2d 1354, 1360 (6th Cir.1992). Therefore, although a classification must be upheld under the rational basis standard if there is any reasonably conceivable state of facts that could provide a rational basis for the classification, "even the standard of rationality ... must find some footing in the realities of the subject addressed by the legislation." *Heller,* —— U.S. at ——, 113 S.Ct. at 2643.

Therefore, "some objectives—such as a bare ... desire to harm a politically unpopular group—are not legitimate state interests." *Cleburne,* 473 U.S. at 446–47, 105 S.Ct. at 3257–58 (internal quotation and citation omitted); *Moreno,* 413 U.S. at 534, 93 S.Ct. at 2825–26. Consequently, "mere negative attitudes, or fear," of a given group, will not suffice as a legitimate governmental purpose. *Cleburne,* 473 U.S. at 439, 105 S.Ct. at 3254. Finally, while the Constitution cannot

---

21. Although several other cases pre-dated *Bowers,* they based their decision not to grant quasi-suspect status to homosexuals on essentially the same point we reject. *See Baker v. Wade,* 769 F.2d 289, 292 (5th Cir.1985) (en banc) ("[b]ecause ... homosexual conduct is not a constitutionally protected liberty interest ... we refuse to hold[] that homosexuals constitute a suspect or quasi-suspect classification"); *National Gay Task Force v. Bd. of Educ.,* 729 F.2d 1270, 1273 (10th Cir.1984), *aff'd by equally divided Court,* 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985) ("[w]e cannot find that a classification based on the choice of sexual partners is suspect"); *Rich v. Secretary of Army,* 735 F.2d 1220, 1229 (10th Cir.1984) (same).

control private prejudice, "neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, *directly or indirectly,* give them effect." *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) (emphasis added).

After carefully considering the asserted governmental interests articulated by the Defendants, and any other possible justifications, we conclude that Issue 3 is not rationally related to any legitimate governmental purpose. Thus, Issue 3 runs afoul of the Equal Protection Clause.

# VI

## ANALYSIS

The Defendants have identified several governmental purposes which they claim to be, at minimum, legitimate, and to which Issue 3 is rationally related. First, the Defendants claim that the government always has an interest in not imposing regulations upon private citizens. Thus, the argument goes, by removing regulations that would give the Plaintiffs any kind of protected status, Issue 3 serves the purpose of not regulating private conduct any more than necessary.

Second, the Defendants claims that Issue 3 serves the legitimate governmental purpose of saving scarce resources, both public and private. Third, the Defendants urge that Issue 3 serves the purpose of "not imposing a uniform, doctrinaire view concerning the moral relevance of homosexual behavior on all segments of the community." Thus, according to the Defendants, "by refraining from dictating one government-mandated view concerning the relevance of sexual orientation, Issue 3 promotes diversity by allowing different groups in the community to hold divergent views on this question."

Fourth, the Defendants claim that Issue 3 gives legal effect to Cincinnati's collective notion of morality. The Defendants also claim that Issue 3 serves the purpose of protecting and nurturing the nuclear family. Finally the Defendants maintain that Issue 3 advances democracy and political integrity by allowing the citizens to make this important decision for themselves and preserving their ability to define and limit the powers of their elected representatives.

## A

### 1 & 2

Assuming *arguendo* that the governmental interests in saving resources and minimizing governmental regulation are legitimate governmental interests, in this case they are not sufficient to justify Issue 3's sweeping prohibitions. First, evidence was offered demonstrating that any money and resources that might be saved by Issue 3's elimination of any and all laws prohibiting discrimination against homosexuals, would be, at best, *de minimis.* Testimony established that time and resources allocated to the sexual orientation provision of the HRO and the EEO is not only minimal but that it does not diminish the City's capacity to enforce existing anti-discrimination provisions regarding the traditional suspect and quasi-suspect classifications (as well as the non-traditional classifications protected by the HRO and the EEO such as Appalachian origin, marital status and heterosexual orientation).

Similarly, evidence established that the inclusion in the EEO and the HRO of the sexual orientation provision would not require the expenditure of additional funds, nor require additional staff or resources. Additionally, one credible witness testified that Issue 3 could even cost the city scarce resources by barring Cincinnati's eligibility for certain types of state and federal programs.

Furthermore, the elimination of the sexual orientation provisions of the HRO and the EEO would not reduce regulation more than a negligible amount at best, because of the existing regulations in the HRO and the EEO, including those regulations pertaining to race, gender, heterosexual orientation, Appalachian origin and marital status. Thus, Issue 3's broad prohibition of all gay rights legislation is too attenuated to these asserted interests. Thus, Issue 3's distinction is arbitrary and irrational. *See Cleburne,* 473 U.S. at 446, 105 S.Ct. at 3257–58.

Consequently, under strict or heightened scrutiny, the asserted goal must also fail. Even assuming that some savings could be derived if sexual orientation were not included in the HRO and EEO, a simple repeal could have accomplished this goal. Therefore, the asserted governmental interest of reducing regulation and saving resources is neither narrowly tailored, nor, substantially related to either a compelling or sufficiently important governmental purpose.

### 3

■ Furthermore, the Defendants assert that Issue 3 serves the significant governmental interest of promoting the "nuclear family." While this asserted goal is certainly an honorable one, we conclude that it is not sufficiently related to Issue 3's universal, prospective ban on all legislation and policy prohibiting discrimination against gays, lesbians and bisexuals to pass constitutional muster.

First, as the Defendants own witness testified, there is no consensus as to a definition of "family" and that more than one definition exists. Furthermore, testimony from both the Plaintiffs' and Defendants' witnesses established that heterosexual males are far more responsible than gays in this society for the break down of the family unit. According to the evidence, this is due, at least in part, to the increased illegitimacy rate and the failure of heterosexual males to remain with the mother and care for, and help raise their children. Furthermore, testimony from both sides demonstrated that divorce is also a great factor contributing to the breakdown of the "nuclear family." Nonetheless, the EEO and HRO continue to prevent discrimination on the basis of marital status.

Additionally, no evidence was produced to explain how Issue 3 could protect the "nuclear family." In fact, the best explanation offered by the Defendants' witness was that Issue 3 would preserve the "potential" for passing laws that could benefit the family. We are, however, unaware of how *allowing* the City Council to prohibit discrimination against gays, lesbians and bisexuals undermines the family or prevents the enactment of "pro-family" legislation. As the trial court in *Evans v. Romer* observed, "[s]eemingly, if

one wished to promote family values, action would be taken that is pro-family, rather than anti some other group." 1993 WL 518586, *8 (Colo.Dist.Ct. Dec. 14, 1993). Thus, removing gays from the list of groups protected from discrimination and barring passage of any such legislation in the future, is simply too remote from the accomplishment of the asserted goal of nurturing the "nuclear family" to give Issue 3 some much as a rational basis. *See Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3257–58.

### 4

■ The Defendants also argue that Issue 3 serves the purpose of "not imposing a uniform, doctrinaire view concerning the moral relevance of homosexual behavior on all segments of the community" and thereby promotes diversity of views on this question. We disagree. In fact, we conclude that Issue 3 accomplishes exactly the opposite.

While the mere absence of a law prohibiting discrimination on the basis of sexual orientation could arguably reflect governmental neutrality on the issue, Issue 3 is an affirmative statement to the City Council and city administration, and to all of the citizens of Cincinnati, that discrimination against homosexuals shall be permitted, and in all likelihood, shall never be prohibited no matter what the circumstances. In fact, Issue 3, as a provision of the Cincinnati City Charter, makes the statement "homosexuality is wrong" one of the city's fundamental tenets. Such a governmental edict has the precise effect of "imposing a uniform, doctrinaire view concerning the moral relevance of homosexual behavior on all segments of the community." Thus, by its very terms, not only is Issue 3 not rationally related to the asserted governmental interests of promoting diversity of views on this topic, but it utterly frustrates it.

Furthermore, anti-discrimination legislation does not impose a point of view upon the community, but rather affects behavior. Thus, a law prohibiting discrimination based on sexual orientation neither requires anyone to *think* a certain way, nor adopt a given point of view about the moral relevance of homosexuality. Rather, it simply affects con-

duct the same way laws prohibiting discrimination against any other group affects conduct (but not beliefs). Additionally, the enactment of laws preventing discrimination against a particular group in private employment and housing, does not interfere with any individual's constitutional rights regarding personal relationships. *See Roberts v. United States Jaycees*, 468 U.S. 609, 620, 104 S.Ct. 3244, 3250–51, 82 L.Ed.2d 462 (1984).

There is, therefore, absolutely no relationship between Issue 3's universal prospective ban on the passage of anti-discrimination laws and the asserted governmental purpose of promoting diversity of views and preventing the imposition of a uniform doctrinal view on all segments of the community. Issue 3 is not only too attenuated from that asserted goal, but it achieves the opposite effect.

**5**

■ Similarly, the Defendants claim that Issue 3 gives effect to Cincinnati's collective notion of morality. While this alone is not necessarily an illegitimate governmental purpose, *see Bowers v. Hardwick*, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846–47, 92 L.Ed.2d 140 (1986), it cannot simply be a surrogate for the majority's desire to discriminate against an unpopular minority group. *See Cleburne*, 473 U.S. at 446–47, 105 S.Ct. at 3257–58. "[M]ere negative attitudes, or fear," of a given group, will not suffice as a legitimate governmental purpose. *See Id.* at 448, 105 S.Ct. at 3258–59.

According to Mark McNeil, coordinator of the Issue 3 campaign, ERNSR's own polls showed that Cincinnati's voters did not understand the language of Issue 3. Furthermore defense witnesses expressed varying, and at times inconsistent, views as to its scope. Thus, considering the confusing language of Issue 3, its uncertain, although clearly sweeping scope, and the lack of any legislative history, it is simply impossible to ascertain what, if any, collective notion of morality Cincinnati has. Furthermore, in light of the grossly inaccurate campaign ads

and other materials available to the voters through the media, mailings, and other sources, it is impossible to know exactly what the voters intended to vote for.[22] It is thus impossible to know what, if any, Cincinnati's "collective notion of morality" is. This asserted purpose is likewise insufficient to justify Issue 3.

**B**

Furthermore, the very structure of Issue 3, its sweeping scope, and its distinct focus on prospectively barring any *anti-discrimination* legislation, policy or regulation, on behalf of gays, lesbians and bisexuals bespeaks [its] "bare ... desire to harm a politically unpopular group...." *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 2825–26, 37 L.Ed.2d 782 (1973) (emphasis in original); *Cleburne*, 473 U.S. at 446–47, 105 S.Ct. at 3257–58. Such an objective can never "constitute a *legitimate* governmental interest." *Moreno*, 413 U.S. 528 at 534, 93 S.Ct. 2821 at 2825–26 (emphasis in original); *Cleburne*, 473 U.S. at 446–47, 105 S.Ct. at 3257–58.

It is true that legitimate governmental purposes can, and have been, articulated in support of Issue 3. However, we can conceive of no legitimate governmental purpose *rationally related* to a law which prohibits a minority group from *ever* obtaining anti-discrimination legislation on its behalf, unless it undertakes the massive and unmitigated—and likely insurmountable—burden of amending the city charter. Such a law implies nothing more than a "bare desire to harm an unpopular group" based on who the members of that group are. The purpose not only to permit discrimination, but also to encourage it, is inherent in the very concept of such a law. As such it is constitutionally defective. *Moreno*, 413 U.S. at 534, 93 S.Ct. at 2825–26; *Cleburne*, 473 U.S. at 446–47, 105 S.Ct. at 3257–58.

---

**22.** For example, the Defendants consistently portrayed Issue 3 as a mere repeal measure which all parties concede it is not. Furthermore, what was ostensibly being repealed were "special rights" for gays which that group has theoretical-ly received *over and above* those enjoyed by other groups. In fact many other non-traditionally suspect groups enjoy not only local, but federal and state protections beyond those given to gays.

## C

■ Finally, Issue 3, far from demonstrating governmental neutrality on the issue of homosexuality, in fact, gives effect to private prejudice. This, the Constitution will not tolerate. *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984). As mentioned above, Issue 3 singles out gays, lesbians and bisexuals and prospectively and universally bars the passage of any and all laws or policies falling within the virtually boundless definition of "protective legislation" or "preferential treatment" for those citizens.

Such a strong message from the government, embodied in the City's fundamental law, effectively places the government's imprimatur on those acts of private bias carried out pursuant to Issue 3's unmistakable mission. Were the government silent on this issue, it could be argued that the government were neutral. Issue 3, however, is not mere governmental silence; it is an affirmative declaration that gays, lesbians and bisexuals are unworthy of protection, now and in the future. It is a declaration that discrimination against them is permissible, and that if they suffer discrimination at the hands of the majority, it is from the majority itself that they must seek help.

Thus, while the Constitution cannot control private prejudices, "neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, *directly or indirectly,* give them effect." *Palmore,* 466 U.S. at 433, 104 S.Ct. at 1882 (emphasis added). In light of our conclusion regarding Issue 3's sweeping scope, we find that Issue 3 indeed gives effect, at the very least indirectly, to private prejudice. It is therefore constitutionally defective.

We therefore conclude that Issue 3 is unconstitutional under even the most deferential standard of review, let alone the most exacting.

## VII

### FIRST AMENDMENT AND VAGUENESS CLAIMS

The Plaintiffs have also made a number of claims based on the First Amendment. Ad-

ditionally, the Plaintiffs argue that Issue 3 is unconstitutionally vague. First, the Plaintiffs claim that Issue 3 infringes their First Amendment rights to free speech and association. The Plaintiffs also claim that Issue 3 infringes their First Amendment right to petition the Government for a redress of grievances. For the following reason, we agree.

## A

### Free Speech and Association

The First Amendment provides that Congress "shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "[F]reedom of speech ... [is] among the most fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by the States." *Thornhill v. Alabama,* 310 U.S. 88, 95, 60 S.Ct. 736, 740–41, 84 L.Ed. 1093 (1940) (footnote omitted); *Meyer v. Grant,* 486 U.S. 414, 420, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425 (1988).

■ "The First Amendment was 'fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *Meyer,* 486 U.S. at 421, 108 S.Ct. at 1891 (citing *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308–09, 1 L.Ed.2d 1498 (1957)). Thus, "[t]he freedom of speech ... guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill,* 310 U.S. at 101–02, 60 S.Ct. at 743–44 (footnote omitted); *Meyer,* 486 U.S. at 420, 108 S.Ct. at 1891. Additionally, " 'statutes that limit the power of the people to initiate legislation are to be closely scrutinized and narrowly construed.' " *Meyer,* 486 U.S. at 420, 108 S.Ct. at 1891 (quoting *Urevich v. Woodard,* 667 P.2d 760, 763 (Colo. 1983)). Finally, "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exer-

cise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 2324–25, 33 L.Ed.2d 154 (1972).

 First, as we have stated, Issue 3 not only repeals the existing prohibition against discrimination against gays, lesbians and bisexuals, but it is undisputed that it forever bars City Council from ever enacting any law policy regulation and ordinance of any kind that would protect gays from discrimination, no matter what the need, no matter how exigent the circumstances. Thus, as we found in *Equality*, Issue 3, eviscerates the very purpose of gays, lesbians and bisexuals, or their organizations, lobbying or petitioning City Council or city administration, or attempting to gain access to those bodies. 838 F.Supp. at 1238. Consequently, there is a significant deterrent for gays, lesbians and bisexuals to get involved in political activities of major importance to the group.

Furthermore, again, as we noted in *Equality*,

> not only will gay, lesbian and bisexual citizens be virtually unable to obtain legislation for their group no matter how great the need, but also their advocacy may expose them to discrimination for which they will have no recourse even remotely comparable to that of other groups, to obtain protection, thereby increasing the risks of, and consequently chilling, such expression.

*Id.* at 1242 (footnote omitted). Clearly, forcing this group to attempt to obtain favorable legislation through the costly and burdensome charter amendment process, with its attendant risk of exposing them to virtually unremediable discrimination, will deter open discourse on the matter and chill expression and association of groups dedicated to bringing about such results. *See Id.* at 1242 n. 5.

In light of the forgoing, we conclude that Issue 3 will hinder the "unfettered interchange of ideas for the bringing about of political and social change[ ]...." *Roth*, 354 U.S. at 484, 77 S.Ct. at 1308; *Meyer*, 486 U.S. at 421, 108 S.Ct. at 1891–92. Furthermore, because Issue 3 imposes upon the Plaintiffs the added burden of attempting to amend the charter every time they seek legislation, Issue 3 unquestionably limits the power of that group to initiate legislation and therefore must be closely scrutinized and narrowly construed. *See Meyer*, 486 U.S. at 420, 108 S.Ct. at 1891.

This does not mean that gays, lesbians and bisexuals are entitled to *successful* lobbing for favorable legislation. There is however, an undeniable and singular deterrent from joining groups, speaking out, or lobbying for, or advocating, the adoption of favorable policy or legislation, or supporting groups or candidates that support certain political beliefs. As such Issue 3 clearly "limit[s] the power of the people to initiate legislation ..." and must face exacting scrutiny. *Meyer*, 486 U.S. at 420, 108 S.Ct. at 1891 (internal quotation omitted).

Furthermore, because the charter amendment process is so much more onerous than lobbying City Council for legislation, gays will be virtually guaranteed that they will not be successful. While this alone may not be sufficient to render Issue 3 unconstitutional, and while gays, lesbians and bisexuals are not *entitled* to anti-discrimination legislation, there is an added factor which renders it violative of the First Amendment.

Issue 3 differs inherently from issues which may properly be relegated to the charter amendment process. As discussed above, Issue 3 bars City Council and city administration from enacting any legislation or policy on behalf of gays, lesbians and bisexuals including anti-discrimination legislation. In order to obtain such legislation, gays, lesbians and bisexuals must seek a charter amendment. Unlike neutral issues which may permissibly be relegated to the initiative process,[23] unsuccessful proponents of a "repeal issue 3" campaign, through their political efforts, will open themselves to the risk of government condoned employment and housing discrimination for which all future avenues of recourse will be closed. An unsuccessful proponent of some neutral issue which must be approved by charter amendment, on the other hand, does not run the risk of suffering discrimination in employment and housing for taking part in, or sup-

---

23. *See, e.g., Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971).

446

porting, that issue. Rather he or she simply risks a political disappointment on that single issue.

Thus, the consequences of attempting to supersede Issue 3 are prohibitive of any attempt to do so, carrying with defeat—a likely consequence due to the Plaintiffs' numerical inferiority and unpopularity—the exorbitant risk of employment and housing discrimination. The social and political stakes associated with requiring an unpopular group to seek anti-discrimination legislation from the majority, therefore, are unique and patently unfair. Such a situation will chill political expression in a way and to a degree not inherent in other subjects properly relegated to the initiative process. This will have the "inevitable effect of reducing the total quantum of speech on a public issue[,]" *Meyer,* 486 U.S. at 423, 108 S.Ct. at 1892, and will deter political association in violation of the First Amendment. *See Equality,* 838 F.Supp. at 1242, 1242 n. 5.

It is also noteworthy that in *Meyer,* the "Appellants argue[ed] that even if the statute imposes some limitation on First Amendment expression, the burden is permissible because other avenues of expression remain[ed] open to appellees...." *Meyer,* 486 U.S. at 424, 108 S.Ct. at 1893. The Court held that the mere fact that other avenues of expression were available did not remedy the Constitutional defects of the statute because the statute restricted access to the most effective and perhaps the most economic avenue of political discourse. *Id.* Thus in *Meyer,* the fact that the statute left open the more burdensome avenues did not relieve the pressure on protected First Amendment expression. *Id.*

In this case, not only is the cost of the charter amendment process incomparably higher and the effort incomparably more onerous, but the political and personal consequences are far higher than merely lobbying the City Council, although political success even at the City Council level is not guaranteed. But similar to the principles enunciated in *Meyer,* the fact that a far more onerous avenue remains open to the Plaintiffs, does not neutralize Issue 3's constitutional defects. *See Meyer,* 486 U.S. at 424, 108 S.Ct. at 1893.

Thus, Issue 3's enormous deterrent effect on political speech and association, renders it unconstitutional.

**B**

**Redress**

■ The Plaintiffs also claim that Issue 3 infringes the Plaintiffs' First Amendment Right to petition the government for redress of grievances. First, it is beyond dispute that under Issue 3 the Plaintiffs would be left without the option of lobbying City Council for legislation on their behalf. The Defendants argue, however, that the Plaintiffs still have the option of amending the city charter. This alternative, the Defendants claim, is nothing short of what the Defendants did in enacting Issue 3 in the first place. We find this argument unpersuasive. For the following reasons we conclude that Issue 3 deprives the Plaintiffs of their rights to petition the government for redress of grievances.

A party seeking to amend the Cincinnati City Charter, as a general rule, has two options. Under the Ohio Constitution, proposed

> [a]mendments to any charter ... may be submitted to the electors of a municipality by a two-thirds vote of the legislative authority thereof, and, upon petitions signed by ten per centum of the electors of the municipality setting forth any such proposed amendment, shall be submitted by such legislative authority.

Ohio Const. art. XVIII, § 9. Thus, as a general rule, those seeking to amend the Cincinnati city charter have two alternatives. They may seek a two thirds vote of the City Council to pass an "ordinance of submission" submitting a proposed charter amendment to the electorate. *See State ex rel. Kittel v. Bigelow,* 138 Ohio St. 497, 497, 502, 21 O.O. 380, 37 N.E.2d 41 (1941); *State ex rel. Citizens v. Widman,* 66 Ohio App.3d 286, 288, 584 N.E.2d 6 (1990). They may also attempt to obtain sufficient signatures from the electorate, which, after submission to the City Council, may also be submitted to the electorate. These two alternatives are wholly separate, *see Bigelow,* 138 Ohio St. at 502, 37 N.E.2d 41; *Widman,* 66 Ohio App.3d at

288, 584 N.E.2d 6, and are the only two avenues available for amending the city charter. In the second scenario, a writ of mandamus may issue compelling the City Council to submit the proposal to the electorate if the City Council abuses its discretion in declining do so. *Bigelow* 138 Ohio St. at 503, 540, 37 N.E.2d 41.

If the Plaintiffs chose to pursue the first option, they would have to petition the City Council to propose and adopt by a two-thirds vote, and "provide by ordinance," a proposed charter amendment repealing Issue 3 and reinstating employment and housing protection for gays, lesbians and bisexuals. *See Widman,* 66 Ohio App.3d 286, 288, 584 N.E.2d 6 (1990); *Bigelow,* 138 Ohio St. at 502, 37 N.E.2d 41. Such City Council action, we conclude, falls within Issue 3's sweeping restrictions on City Council's authority in this area. This avenue would require the City Council, with the help of the voters, to give homosexuals protected status or preferential treatment. Furthermore, even if the proposed charter were never approved, the enactment of such an ordinance by ⅔ of the City Council clearly bespeaks a favorable "policy" with respect to homosexuality. Thus, Issue 3's preemptive breadth cuts off yet another avenue of redress for the Plaintiffs which is available to all other citizens.

Under the second alternative, the Plaintiffs may present to the City Council a petition signed by ten per cent of the voters. The Defendants argue that Issue 3 would not prohibit the Plaintiffs from proceeding in this manner, because the City Council's role in such situations is purely ministerial. However, under this alternative, it is still the responsibility of the City Council to "provide by ordinance" the proposal to the electors. *Blackwell v. Bachrach,* 166 Ohio St. 301, 306, 2 O.O.2d 219, 143 N.E.2d 127 (1957); *Widman,* 66 Ohio App.3d at 288, 584 N.E.2d 6.

Moreover, while it appears that the City Council's role in this regard *is* ministerial, *see Widman,* 66 Ohio App.3d. at 291, 584 N.E.2d 6, our reading of Issue 3 reveals no exceptions for even purely ministerial functions which would consist of enacting an ordi-

nance which would have the ultimate effect of providing gays, lesbians and bisexuals with protected status or preferential treatment. This option, as well, would not be available to the Plaintiffs under Issue 3.

Additionally, even if this one avenue remained open to the Plaintiffs, that alone would not be enough to cure Issue 3's constitutional defects. First, if Issue 3 did not prohibit City Council action under the second option, in the event that the City Council erroneously interpreted Issue 3's broad language as prohibiting such action, the Plaintiffs would be required to seek a writ of mandamus. *See Bigelow* 138 Ohio St. at 503, 540, 37 N.E.2d 41. Even assuming the writ issued in such a case, the Plaintiffs would have been required to tackle yet another resource consuming hurdle in an already arduous process.

Furthermore, even if this path were open to the Plaintiffs, this is clearly the narrowest, and most burdensome path to take in pursuing legislation. Thus, not only would the right to directly petition the City Council be cut off from the Plaintiffs, but so would at least one of the two avenues of the charter amendment process. While it is uncertain exactly what effects issue 3 would have on the second charter amendment alternative, it is clear that even if that single path remained unobstructed, the Plaintiffs would be acutely deprived of their right to petition the government for a redress of grievances.

Finally, because Issue 3 bars direct City Council legislation as well as the first of the two charter amendment options, with only the second of the two charter amendment options even arguably left open, Issue 3's chilling effect is drastically intensified. Consequently, we conclude that Issue 3 violates the Plaintiffs' First Amendment rights to free speech and association, and to petition the government for a redress of grievances.[24]

## C

### Vagueness

The Plaintiffs also allege that Issue 3 is unconstitutionally vague in violation of

---

24. Such added obstacles to the political process bolsters this Court's conclusion that Issue 3 un-

constitutionally "fences out" the Plaintiffs from the political process. See Part III, above.

the Due Process Clause of the Fourteenth Amendment because its effect, particularly on the Human Rights Ordinance, is unclear. Legislation must be sufficiently clear to satisfy the constitutional requirements of due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972).

As the *Grayned* Court observed, vague laws are offensive for several reasons, first,

> because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

*Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99 (footnotes omitted); *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Springfield Armory, Inc. v. City of Columbus,* 29 F.3d 250, 251–52 (6th Cir.1994); *Planned Parenthood Ass'n v. City of Cincinnati,* 822 F.2d 1390, 1399 (6th Cir.1987). Additionally, where a vague statute touches upon "sensitive areas of basic First Amendment freedoms," it operates to inhibit the exercise of those freedoms. *Grayned,* 408 U.S. at 109, 92 S.Ct. at 2299 (internal quotation omitted). Similarly, as the Sixth Circuit observed just weeks ago, when "criminal penalties are at stake, as they are in the present case, a relatively strict test is warranted." *Springfield Armory,* 29 F.3d at 253 (citing *Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. at 1193–94).

Confusion surrounding Issue 3's scope and impact was abundant at trial and otherwise on the record. In fact, the Defendants' own witnesses offered differing views regarding Issue 3's scope. For example, Chris Finney, an attorney who drafted Issue 3, admitted testifying at deposition that Issue 3 would void the entire HRO. At trial, he maintained that it would remove the sexual orientation provision from the ordinance. Mark McNeil, coordinator for the Issue 3 campaign, on the other hand, testified that Issue 3 did not remove "sexual orientation" from the HRO but removed only protections for lesbians, gay men and bisexuals.

It is not surprising that the intervening Defendants offered conflicting interpretations of Issue 3's effect, at times arguing that Issue 3 removes all sexual orientation-based protections and at other times urging that Issue 3 draws a distinction between protections available to gays, lesbians and bisexuals and those available to heterosexuals. On its very face, Issue 3 lends itself to contradictory interpretations.

First, its title suggests an interpretation of its scope which would extend to all laws granting protections based on sexual orientation, whether homosexual or heterosexual. The body of Issue 3, however, indicates that existing sexual orientation provisions are still in effect with regard to heterosexuals. Further ambiguities are found in its reference to homosexual "orientation, status, conduct or relationship" without ever offering a definition of such terms which could unquestionably cover a remarkably broad field of activities.

In fact, evidence in this case has established that the Plaintiff, H.O.M.E., and other employers subject to the HRO, will be unable to determine what effect Issue 3 will have on the HRO. Because the ordinance contains civil and criminal penalties for non-compliance, Issue 3 exposes H.O.M.E. and other employers to criminal penalties without fairly apprising them of its impact on their employment obligations. For example, H.O.M.E. does not know whether it can hire a lesbian over a heterosexual person solely on the basis of sexual orientation, or whether it will face a civil and criminal penalty for doing so. Such agencies and other employers and property owners are vulnerable to penalties despite good faith efforts to comply with the law.

Furthermore, in *Grayned,* the Court observed that vague statutes "inevitably lead citizens to steer far wider of the unlawful

zone ... than if the boundaries of the forbidden areas were clearly marked." 408 U.S. at 109, 92 S.Ct. at 2299 (citations and internal quotations omitted). If Issue 3 does not prohibit discrimination based on heterosexual orientation or conduct, those who steer clear of such lawful conduct by so discriminating, have a more restrictive life imposed upon them than the law requires, due to the law's own ambiguities. If Issue 3 does prohibit such discrimination, as noted above, those who are not put on proper notice risk criminal penalties without fair warning. We find that Issue 3 does not give employers, landlords and others fair notice as to whether heterosexuals are protected against discrimination based on sexual "orientation, status, relationship or conduct."

Issue 3 can also lead to discriminatory enforcement. In *Grayned,* the court stated, "[a] vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." 408 U.S. at 108–09, 92 S.Ct. at 2298–99 (footnote omitted). Issue 3 does not provide the city with "explicit standards for those who apply" it. *Id.* at 108, 92 S.Ct. at 2298–99. With the ambiguous scope of Issue 3, decisions to enforce the HRO with respect to heterosexuals only may be conducted on an *ad hoc* basis. While Issue 3 obviously sweeps broadly, its full impact is uncertain. As a result, the citizens affected by this legislation are left vulnerable to discriminatory enforcement.

■ Finally, the void-for-vagueness doctrine also relates to legislation that limits conduct protected by the First Amendment. Indeed, where "the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982) (footnote omitted). Issue 3 clearly involves rights associated with free speech and association as discussed above. And because the full extent of Issue 3's scope is unclear, citizens, are likely to be discouraged from engaging in expressive and associational activities to obtain passage of legislation, due to the uncertainty of Issue 3's broad, yet ill-defined scope. Issue 3, therefore, is unconstitutionally vague.

## CONCLUSION

This has been an extremely profound and controversial case. The Court has endeavored to thoroughly address and analyze each of the claims and assertions advanced by the parties. In light of the length of our opinion, we have summarized below our conclusions set fourth in detail in the forgoing opinion.

We conclude that Issue 3 indeed infringes the Plaintiffs' fundamental right to equal access to the political process. As such, this Court was obligated to subject Issue 3 to strict scrutiny review. We also hold that gays, lesbians and bisexuals belong to a quasi-suspect category, thus requiring the application of heightened scrutiny analysis to Issue 3. Based on the record and our analysis of the case law, we find that under strict or heightened scrutiny as well as under rational basis review, Issue 3 was insufficiently linked to any governmental interest to pass constitutional muster.

With respect to the Plaintiffs' First Amendment claims, we hold that Issue 3 violates the Plaintiffs' First Amendment rights to free speech and association, and to petition the government for a redress of grievances. Finally, we hold that Issue 3 is unconstitutionally vague.

Accordingly, for the forgoing reasons, we GRANT the Plaintiffs request for a permanent injunction, and hereby PERMANENTLY ENJOIN the implementation and enforcement of the proposed charter amendment known as Article XII or Issue 3.

SO ORDERED.